CIVIL SERVICE COMMISSION v DEPARTMENT OF LABOR

MATULEWICZ v GOVERNOR

Docket No. 77816. Argued January 23, 1986 (Calendar No. 21).—
Decided March 28, 1986. Rehearing denied 425 Mich 1201.

The Civil Service Commission brought an action in the Ingham
Circuit Court against the Department of Labor, seeking a
declaration that § 206 of the workers' compensation act which
abolishes the position of hearing referee and § 213 of the act
which establishes a Board of Magistrates that would be ex-
empted from civil service are violative of the civil service
provisions of Const 1963, art 11, § 5.

Dennis Matulewicz, a hearing referee, and others brought a
similar action in the Ingham Circuit Court against the Gover-
nor and others, seeking a declaration that §§ 206 and 213 are
unconstitutional and mandamus to compel continued employ-
ment of current hearing referees within the Workers' Compen-
sation Bureau and classified civil service. The Governor filed an
Executive Message with the Supreme Court, requesting that
the Ingham Circuit Court be authorized to certify a question to
the Court. In lieu of granting the request, the Supreme Court
directed the Ingham Circuit Court to establish an accelerated
schedule, proceed to trial, and issue a final judgment. The
actions were consolidated in the circuit court.

The Ingham Circuit Court, Robert Holmes Bell, J., declared
§ 213 unconstitutional and permanently enjoined the defen-
dants from taking further steps to effectuate it or provisions of
1985 PA 103 denominated by the Legislature as not severable
from § 213. The Supreme Court thereafter granted the defen-
dants leave to appeal prior to decision by the Court of Appeals.

In an opinion by Justice Levin, joined by Chief Justice
Williams and Justices Cavanagh and Boyle, the Supreme
Court *held:*

Section 206, abolishing the position of hearing referee, and

REFERENCES FOR POINTS IN HEADNOTES

[1-3] Am Jur 2d, Workmen's Compensation §§ 540 *et seq.*

See the annotations in the ALR3d/4th Quick Index under Workers'
Compensation.

§ 213, establishing a Board of Magistrates, do not violate Const 1963, art 11, § 5.

1. The Legislature may, consistent with constitutional provisions, transfer duties and powers formerly discharged by civil service employees to a board or commission outside the civil service system. The establishment, by 1985 PA 103, § 213, of the Board of Magistrates to replace the hearing referees, and the substantial increase in the power of the magistrates to decide cases with a high degree of finality by eliminating, under other sections of Act 103, review of decisions of the magistrates de novo does not merely transfer the duties of the referees to the magistrates; rather, the power of the magistrates and the importance of their decisions is actually increased.

2. The magistrates are vested with the power presently vested in the members of the Workers' Compensation Appeal Board, whose members were thought to be performing a function of sufficient importance and dignity to be removed from the civil service system. Removing the magistrates from civil service and subjecting their appointment and retention to the political process, thus making them politically accountable, is consistent with constitutional principles. Decisions of hearing referees were reviewable de novo by members of the WCAB, who in turn have always served for fixed terms, with reappointment at the pleasure of the Governor. The changes occasioned by Act 103 effect no further politicization of the workers' compensation system than has existed previously.

3. Replacement of the referees by the magistrates does not deprive the referees of civil service status; the promise made to them of continued employment can be fulfilled without restricting the Legislature from enlarging the functions and duties of workers' compensation hearing officers and from requiring that the officers be selected by a process different from that employed in the past, that their tenure be limited, and that their accountability to the political process be increased.

4. The constitutional provision authorizing the Civil Service Commission to classify all positions and empowering the appointing authorities to create or abolish positions for reasons of administrative efficiency, in terms, does not bar the Legislature from creating new positions or abolishing old and changing respective duties and responsibilities.

Chief Justice WILLIAMS, joined by Justices CAVANAGH and BOYLE, concurring, stated that § 213 of 1985 PA 103 lies within a reasonable construction of Const 1963, art 11, § 5. The constitution must be construed in light of the circumstances known

to the framers at the time of the enactment of the civil service amendment. Legislation existing at that time permitted boards with solely adjudicative functions and boards and commissions which performed their primary functions through individual members. Thus, it was well within the contemplation of the framers to except from classified civil service a board which performed solely adjudicative functions similar to the Board of Magistrates and a multimember commission which could perform its primary functions through individual commissioners. The attributes of the Board of Magistrates are consistent with requirements of case law in that it is a board of considerable importance and dignity which serves on appointment of the Governor, performs adjudicative duties subject to very limited review, has quasi-legislative and quasi-executive responsibilities in that it has authority to create its own procedural rules and has authority to hire and fire its own employees, is autonomous and independent, and may act collectively. Treatment of the Board of Magistrates as exempt from civil service requirements comports with the underlying purpose of the civil service amendment to protect the great bulk of civil servants from partisan hiring and firing, while permitting popular representation and public accountability. Application of these factors to 1985 PA 103, § 213 leads to the conclusion that the Board of Magistrates is properly excepted from the civil service.

Reversed.

Justice ARCHER, joined by Justices BRICKLEY and RILEY, dissenting, stated that the Board of Magistrates created under § 213 of the workers' compensation act which purported to except board members from classified civil service is not a board or commission excepted from classified civil service under Const 1963, art 11, § 5; § 213 thus should be held to be violative of art 11, § 5, and § 206, which abolishes the position of hearing referee, and all other sections of 1985 PA 103 not severable from § 213 should be rendered inoperative.

At the time the constitutional amendment exempting members of boards or commissions from classified civil service was adopted, the phrase "boards or commissions" was intended to mean a body which carried out all or some of its primary functions as a collective entity rather than through individual members. The common understanding of the phrase did not change when Const 1963, art 11, § 5 was adopted. With numerical specificity, art 11, § 5 excepts from the covered departments of state government only the department head and no more than five additional positions, leaving within the classified civil service some 57,000 employees of the executive branch, includ-

ing many persons who are responsible for the supervision of thousands of employees and the expenditure of millions of dollars of public funds. The expression of such closely guarded numerical exceptions within the operating departments of state government, leaving positions of high importance within the classified civil service, leads to the conclusion that the drafters of the amendment would not undo their work by exempting boards and commissions unless they were uniquely different from other functions of state government.

While independence or autonomy is one of the unique characteristics which distinguished an exempt board or commission at the time the civil service amendment was adopted, the characteristic of collective deliberation, so common in those boards and commissions and which represents the most common understanding, literally and historically, of the phrase "boards and commissions," cannot be dismissed. Because the Board of Magistrates created under § 213 is not required to carry out any of its primary functions as a collective entity, the board is not a true board for the purpose of the "boards" and "commissions" exception of art 11, § 5.

### OPINION OF THE COURT

1. WORKERS' COMPENSATION — CONSTITUTIONAL LAW — CIVIL SERVICE — HEARING REFEREES — BOARD OF MAGISTRATES.

    Amendment of the workers' compensation act to abolish the civil service position of hearing referee and establish a Board of Magistrates in its place outside the civil service system to hear and adjudicate workers' compensation claims did not violate the civil service provision of the constitution (Const 1963, art 11, § 5; 1985 PA 103, MCL 418.206, 418.213; MSA 17.237[206], 17.237[213]).

### CONCURRING OPINION BY WILLIAMS, C.J.

2. WORKERS' COMPENSATION — CONSTITUTIONAL LAW — CIVIL SERVICE — BOARD OF MAGISTRATES.

    *The Board of Magistrates established under 1985 PA 103, § 213, is properly excepted from the civil service; when construed in light of the circumstances surrounding the enactment of the civil service amendment of the constitution, it is seen to be the type of board within the contemplation of the framers of the amendment to be excepted from civil service; its attributes are consistent with requirements of case law with respect to boards excepted from civil service; and treatment of the board as exempt comports with the underlying purpose of the amendment to protect the great bulk of civil servants from partisan*

*hiring and firing, while permitting popular representation and public accountability (Const 1963, art 11, § 5; 1985 PA 103, MCL 418.213; MSA 17.237[213]).*

DISSENTING OPINION BY ARCHER, J.

3. WORKERS' COMPENSATION — CONSTITUTIONAL LAW — CIVIL SERVICE — HEARING REFEREES — BOARD OF MAGISTRATES.

*The Board of Magistrates created under § 213 of the workers' compensation act which purported to except board members from classified civil service is not a board or commission excepted from classified civil service under Const 1963, art 11, § 5; § 213 should be held to be violative of art 11, § 5, and § 206, which purported to abolish the position of hearing referee, and all other sections of 1985 PA 103 not severable from § 213 should be rendered inoperative (Const 1963, art 11, § 5; 1985 PA 103, MCL 418.206, 418.213; MSA 17.237[206], 17.237[213]).*

*Warner, Norcross & Judd* (by *Paul T. Sorensen, Richard E. Cassard,* and *William J. Barrett*) for plaintiff Michigan Civil Service Commission.

*Levin, Levin, Garvett & Dill* (by *Erwin B. Ellmann* and *Jeffrey A. Heldt*) for plaintiff Matulewicz.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *George H. Weller,* Assistant Attorney General, for the defendants.

Amici Curiae:

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Robert P. Young, Jr.,* and *Robert W. Powell*) for Greater Detroit Chamber of Commerce.

*Jordan Rossen,* General Counsel, and *Ralph O. Jones,* Associate General Counsel, for International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW.

*Miller, Cohen, Martens & Ice, P.C.* (by *Mark H.*

*Cousens* and *Glenda L. Pittman),* for Michigan Federation of Teachers, AFL-CIO.

*Levine, Benjamin, Tushman, Bratt, Jerris & Stein, P.C.* (by *Barrie R. Bratt),* for Michigan Injured Workers and Michigan Trial Lawyers Association, and (by *Lucinda Keils)* for Michigan Trial Lawyers Association.

*Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, P.C.* (by *Theodore Sachs* and *Andrew Nickelhoff),* *Sharon McPhail,* and *Edgar Jerome Dew* for Wolverine Bar Association and National Conference of Black Lawyers, Michigan Chapter.

*Lidia Gulawsky* for Women Lawyers Association of Michigan.

*Wade H. McCree, Jr.,* for Workers' Compensation Law Section of the State Bar of Michigan.

LEVIN, J. The questions presented concern the constitutionality of legislation, 1985 PA 103, that removes workers' compensation hearing officers from the state civil service by organizing them in a board.

The constitution provides that the state civil service system consists of "all . . . in the state service" other than those specifically excepted or exempted. "[M]embers of boards and commissions" are excepted.[1] Act 103 organizes workers' compen-

[1] "The classified state civil service shall consist of all positions in the state service except those filled by popular election, heads of principal departments, members of boards and commissions, the principal executive officer of boards and commissions heading principal departments, employees of courts of record, employees of the legislature, employees of the state institutions of higher education, all persons in the armed forces of the state, eight exempt positions in the office of the governor, and within each principal department, when

sation hearing officers in a "Board of Magis-
trates."[2]

The circuit judge held that the hearing officers
are not members of a "proper" board or commis-
sion, and that § 213 (establishing the Board of
Magistrates) of Act 103 is an unconstitutional
attempt to evade the constitutional limitation.
This Court granted bypass of the Court of Appeals.
We reverse and hold that § 213 of Act 103 is
constitutional.

I

The challenged provisions were enacted in con-
junction with a provision of Act 103 that elimi-
nates de novo review by the workers' compensa-
tion appellate tribunal (presently the Workers'
Compensation Appeal Board), hereafter under Act
103 to be known as the Workers' Compensation
Appellate Commission, of decisions of workers'
compensation hearing officers (presently the refer-
ees), hereafter to be known as magistrates. A
magistrate's decision is to be considered conclusive
by the appellate commission if supported by com-
petent, material, and substantial evidence on the
whole record.[3] The Legislature sought thereby to
reduce the delay in adjudicating workers' compen-
sation claims, which had been attributed to a large
backlog in the WCAB resulting from the appeal of
seventy-five to eighty-five percent of referee
awards.[4]

Cases filed after March 31, 1986, are to be heard

requested by the department head, two other exempt positions, one of
which shall be policy-making. The civil service commission may
exempt three additional positions of a policy-making nature within
each principal department." Const 1963, art 11, § 5.

[2] MCL 418.213; MSA 17.237(213).

[3] See ns 25 and 26.

[4] See n 33 ff.

by members of the Board of Magistrates. The position of hearing referee is eliminated next year, as of March 31, 1987.

## A

Act 103 reduces the number of hearing officers from thirty-nine referees[5] to thirty magistrates.[6] The number of members of the appellate tribunal is reduced from fifteen members of the WCAB to seven members of the appellate commission.[7]

A qualifications advisory committee, with six members appointed by the Governor, is created to develop a written examination to be administered to applicants for the position of magistrate, to recommend persons for appointment by the Governor to the Board of Magistrates and appellate commission,[8] and to evaluate biannually the performance of magistrates. The committee may recommend suspension or removal.[9]

---

[5] Report of Professor Theodore J. St. Antoine, *Workers' compensation in Michigan: Cost, benefits and fairness,* December 12, 1984, p 67.

[6] MCL 418.213; MSA 17.237(213).

[7] MCL 418.251; MSA 17.237(251), MCL 418.274; MSA 17.237(274).

[8] MCL 418.274; MSA 17.237(274).

[9] "The committee shall consist of persons who have experience in the area of worker's compensation." MCL 418.209; MSA 17.237(209).

"The qualifications advisory committee shall develop a written examination. The examination shall be administered to applicants for the position of worker's compensation magistrate in order to determine the applicant's ability and knowledge with regard to worker's compensation in the following areas:

"(a) Knowledge of this act.

"(b) Skills with regard to fact finding.

"(c) The Michigan rules of evidence.

"(d) A basic understanding of human anatomy and physiology." MCL 418.210(1); MSA 17.237(210)(1).

"(1) The qualifications advisory committee shall evaluate the performance of each worker's compensation magistrate at least once every 2 years. The evaluation shall be based upon at least the following criteria:

"(a) The rate of affirmance by the appeal board and the appellate

The Governor is empowered to appoint the magistrates and, as before, the members of the appellate tribunal (the appellate commission).[10] The authority of the director of the Bureau of Workers' Compensation to appoint workers' compensation hearing officers[11] is, in effect, eliminated.

The term of office of both members of the Board of Magistrates and of the appellate commission is four years.[12] Civil service system tenure for workers' compensation hearing officers (the referees) is accordingly eliminated. The continuing tenure in office of hearing officers, as well as (as before) of

commission of the worker's compensation magistrate's opinions and orders.

"(b) Productivity including reasonable time deadlines for disposing of cases.

"(c) Manner in conducting hearings.

"(d) Knowledge of rules of evidence as demonstrated by transcripts of the hearings conducted by the worker's compensation magistrate.

"(e) Knowledge of the law.

"(f) Evidence of any demonstrable bias against particular defendants, claimants, or attorneys.

"(g) Written surveys or comments of all interested parties.

"Information obtained under this subdivision shall be exempt from disclosure under the freedom of information act, Act No. 442 of the Public Acts of 1976, being sections 15.231 to 15.246 of the Michigan Compiled Laws.

"(2) Upon completing an evaluation under this section, the qualifications advisory committee shall submit a written report including any supporting documentation to the governor regarding that evaluation which may include recommendations with regard to 1 or more of the following:

"(a) Promotion.

"(b) Suspension.

"(c) Removal.

"(d) Additional training or education.

"(3) The governor shall respond in writing to the committee regarding the action taken in response to the report of the committee." MCL 418.212; MSA 17.237(212).

[10] MCL 418.213; MSA 17.237(213), MCL 418.274; MSA 17.237(274), MCL 418.251; MSA 17.237(251).

[11] MCL 418.211; MSA 17.237(211).

[12] MCL 418.213; MSA 17.237(213), MCL 418.274; MSA 17.237(274).

members of the appellate tribunal, is subjected to the political process. Additionally, the Governor is barred from reappointing as a member of the board or commission a person who has served for twelve years.[13] The Governor may remove a member for good cause, including lack of productivity or other neglect of duties.[14]

A chairperson of the board and a chairperson of the commission are to be appointed by the Governor from among the members who serve in the office of chairperson at the pleasure of the Governor. The chairperson may establish productivity standards that are to be adhered to by the employees and members of the board or commission and has general supervisory control of and is in charge of the employees and the assignment and scheduling of the work of the board or commission.[15] The power of the director of the bureau to assign cases to the hearing officers[16] is thereby eliminated.

The board and commission are both authorized to employ legal assistants for the purpose of legal research and otherwise assisting the individual members and the board and commission. The board and commission are also both authorized to promulgate rules and administrative hearing procedures.[17]

B

Magistrates will be required to file concise written opinions stating reasons for decisions, includ-

[13] *Id.*

[14] A member of the board or commission "may be removed by the governor for good cause which shall be explained in writing to the" member. "Good cause for removal shall include, but not be limited to, lack of productivity or other neglect of duties." MCL 418.213; MSA 17.237(213), MCL 418.274; MSA 17.237(274).

[15] *Id.*

[16] MCL 418.205; MSA 17.237(205).

[17] MCL 418.213; MSA 17.237(213), MCL 418.274; MSA 17.237(274).

ing findings of fact and conclusions of law.[18] The referees were expected only to state their decision in conclusory terms and ordinarily did so by filling in the blank spaces on a one-page printed-form order.

As before, the hearing officer's decision is final unless appealed[19] and seventy percent of the compensation awarded must be paid to the injured worker or his dependents during the pendency of an appeal to the appellate commission.[20]

The hearing officer's decision is reviewable, as before, by a three-member panel of an appellate tribunal, the appellate commission.[21] A panel's decision is reviewable by the entire commission on request of the chairperson if the chairperson concludes that the decision may establish a precedent with regard to workers' compensation in this state, or upon request of two or more members of the commission.[22] Decisions of a panel of the workers' compensation appeal board are the "final decision of the board."[23]

The workers' compensation appeal board reviews referee decisions de novo, generally on the record made before the referee, although it is authorized to receive additional evidence.[24] The findings of fact of a magistrate are to be considered conclusive by the commission if supported by competent, material, and substantial evidence on the whole record, defined as such evidence, considering the whole record, as a reasonable mind will accept as adequate to justify the conclusions. The appellate

---

[18] MCL 418.847; MSA 17.237(847).
[19] MCL 418.851; MSA 17.237(851).
[20] MCL 418.862; MSA 17.237(862), added by 1975 PA 34.
[21] MCL 418.274; MSA 17.237(274).
[22] *Id.*
[23] MCL 418.261; MSA 17.237(261).
[24] MCL 418.859; MSA 17.237(859).

commission may authorize the receipt of additional evidence, but it is limited to a review of only those specific findings of fact and conclusions of law that the parties have requested be reviewed. The review is to be both a qualitative and quantitative analysis of the evidence to assure a full, thorough, and fair review.[25]

As before, on application, not as of right, judicial review is obtainable in the Court of Appeals and this Court.[26] Findings of fact made by the appellate commission, acting within its powers, in the absence of fraud, shall be conclusive.[27]

C

Cases filed after March 31, 1986, and those theretofore filed, not heard by March 31, 1987, are to be heard by the magistrates. The referees will continue to hear cases filed on or before March 31, 1986. The position of hearing referee is abolished as of March 31, 1987.[28] The Workers' Compensation Appeal Board is eliminated as of July 1, 1989, or earlier if there are no more cases to be decided by the appeal board.[29] The Governor may appoint additional members to the appeal board to expedite decision in cases before the board which, in 1984, had a five- to six-year backlog.[30]

D

Included in the legislation are a number of

[25] MCL 418.861a; MSA 17.237(861a).

[26] MCL 418.861a(14); MSA 17.237(861a)(14). Former MCL 418.861; MSA 17.237(861).

[27] The constitution provides that "[f]indings of fact in workmen's compensation proceedings shall be conclusive in the absence of fraud unless otherwise provided by law." Const 1963, art 6, § 28.

The statute provides that the "findings of fact made by the commission acting within its powers, in the absence of fraud, shall be conclusive." MCL 418.861a(14); MSA 17.237(861a)(14).

[28] MCL 418.206; MSA 17.237(206).

[29] MCL 418.266; MSA 17.237(266).

[30] MCL 418.251; MSA 17.237(251).

significant substantive and other procedural reforms. The Legislature anticipated that the establishment of the Board of Magistrates, and the consequent elimination of the position of hearing referee and their civil service tenure, would be challenged. It is provided that if the creation of the Board of Magistrates is found to be invalid by this Court, some of the other amendments shall also be invalid and are not severable, while others shall nevertheless be valid and are severable.[31]

---

[31] 1985 PA 103, § 4.

The non-severable provisions pertain to:

—a requirement that the claimant prove entitlement by a preponderance of the evidence and that in the absence of a claim for review, the order of a magistrate is the order of the bureau (§ 851)

—medical benefits pending an appeal (§ 862[2])

—the limitation of attorneys fees (§ 858)

—hearing and mediation application and procedures (§ 222)

—employee exclusions from the act (§§ 119, 151[1][b], and 161[1][d] and [4])

—payment of compensation in weekly installments and penalty for nonpayment (§ 801)

—redemption of personal injury liability by payment of lump sum pursuant to approved agreement (§ 835[1])

—the liability of employer to sub-employee if contractor engages persons who would not be considered employees under 161(1)(d) and the liability of a principal for wilfully encouraging a person of employee status to pose as a contractor (§ 171[3] and [4])

—coordination of payments with contributions to qualified profit sharing plan under § 401(a) of IRC (§ 354[1][f])

—the effect on compensation payments of remarriage of wife or maturity of child (§ 335)

—payment of benefits for death or disability to a vocationally handicapped person (§§ 921, 925 and 935)

—an employer's duty to furnish medical care, dental service, etc. (§ 315[1])

—the liability of a carrier or fund determined by a hearing referee or magistrate, and reimbursement (§ 852)

—an employer's failure to comply with the act, and misdemeanor, penalty and employee's entitlement to damages (§ 641)

—the examination of an employee by a physician at the request of the employer, report to attorney, refusal of employee to submit to an exam, and testimony of physician (§ 385)

—the repeal of extension of time to claim review by appeal board (§ 851a[2])

—the provision that payment of nursing care shall not be made for periods more than one year prior to appeal for hearing (§ 381[3])

## II

Act 103, reorganizing the adjudicative function in workers' compensation cases, was based on the recommendations in the report on workers' compensation in Michigan, submitted in December, 1984, by Professor Theodore St. Antoine, the Governor's special counselor on workers' compensation.[32]

## A

The author of the report saw no reason for major structural changes at the referee level. The backlog at the referee level was declining, and, with the recent addition of ten additional referees, the bureau's aim of deciding ninety percent of all contests within nine months appeared feasible and satisfactory.[33]

The situation at the appeal board level was, however, seen as very different. During the past decade, between seventy-five and eighty-five percent of all referee awards were appealed. The board's backlog had increased from 2,000 cases to almost 7,000 in eight years, the equivalent of five to six years' output by the appeal board.[34]

De novo review, described in the report as an

—the abolition of the hearing referee position (§ 206)

—the elimination of the appeal board (§§ 251[3], 255[3], 261[5], 265[4], and 266)

—the creation of the appellate commission and procedure for a claim for review (§§ 274 and 859a)

—the provision that beginning October 1, 1986, magistrate's finding of fact shall be conclusive if supported by competent, material, and substantial evidence on the whole record (§ 861a[3])

—the repeal of the procedure for review by appeal board, and the requirement of written opinions and conclusions of law (§ 859[2])

—a right to appeal to the appellate commission where the matter has been pending before the appeal board for three or more years (§ 860)

[32] Report of Professor Theodore J. St. Antoine, n 5 *supra,* pp 68-71.

[33] *Id.,* p 68.

[34] *Id.*

"open invitation to disappointed litigants and their lawyers to seek to retry the case from scratch,"[35] was seen as the principal cause. Having in mind that there is now a large body of precedent, that over the years referees were affirmed on questions of law about sixty-six percent of the time and on issues of fact about eighty-two percent of the time, and the backlog at the appellate level, de novo review, Professor St. Antoine said, is no longer "a luxury that can be afforded, or a procedure that is needed" and should be eliminated.[36] A referee should become a "true-decision maker," and the decision at that level "a much more dispositive step in the administrative process."[37]

Drawing on an earlier report by the former Chief Judge of the Court of Appeals, T. John Lesinski, Professor St. Antoine recommended that the referees be required to support their decisions with findings of fact and conclusions of law. Their findings of fact should be conclusive if supported by competent, material, and substantial evidence on the whole record.[38]

The appeal board, Professor St. Antoine said, should be "streamlined," by creating a new five- or possibly seven-member board, which should be able to handle the anticipated reduced number of appeals, given the substantially reduced record-reading and fact-finding responsibilities, and the use of legal assistants.[39]

[35] *Id.*, p 69.

[36] *Id.*

[37] *Id.*, pp 69, 68.

[38] *Id.*, pp 71-72.

The report also recommended that the appealing party should be required to narrow the appeal board's inquiry and specify the portions of the transcript relied on. Where the decision of the hearing officer is affirmed, the appellate tribunal ought to be able to act without preparing a formal opinion when it finds that it can adopt the hearing officer's findings. *Id.*, p 72.

[39] *Id.*, p 75.

Although the constitution provides that the civil service commission shall "determine by competitive examination and performance exclusively on the basis of merit, efficiency and fitness the qualifications of all candidates for positions in the classified service,"[40] the commission had permitted department heads and the boards and commissions to appoint any member of the state bar as a hearing officer, hearing examiner, or referee.[41] Workers' compensation referees had acquired civil service status as a result of appointment in that manner. Although Professor St. Antoine could find no hard data providing significant support for accusations that referees were biased, he "concede[d] that a perception of bias or of political favoritism in their appointment can be almost as damaging to the acceptability of their awards."[42] He urged the Legislature or the Civil Service Commission "to establish a bipartisan [administrative law judge][43] Qualifications Advisory Committee to interview and evaluate prospective candidates, with ratings to be transmitted confidentially to the appointing authority."[44]

B

One month after Professor St. Antoine's report was issued, a bill was introduced in the Legislature incorporating his principal recommendations. The appellate tribunal would be reduced from fifteen members to seven, and would be renamed the appellate commission.[45] Workers' compensation

---

[40] Const 1963, art 11, § 5, ¶ 4.

[41] Statement of Assistant Attorney General George Weller during oral argument in this Court.

[42] St. Antoine, n 5 *supra,* p 75.

[43] The report noted that the referees are informally and almost universally known as administrative law judges. *Id.,* p 67.

[44] *Id.,* p 75.

[45] SB 7, § 274.

hearing officers would be known as hearing judges and would be required to file written opinions stating findings. De novo review would be eliminated, and the findings of fact and conclusions of law[46] of a hearing judge would be conclusive if supported by competent, material, and substantial evidence on the whole record.[47] Hearing judges and members of the commission would be appointed by the Governor on the recommendation of a newly created seven-member workers' compensation council.[48]

The bill made virtually no changes in the duties and functions of the hearing officers, except the requirement that a written opinion shall be filed. The bill did not organize the hearing officers in a board.

The first full Senate revision would have created a workers' compensation commission and designated both the hearing and appellate members as workers' compensation commissioners.[49] This was done according to the accompanying analysis to remove the hiring and firing constraints of civil service and to ensure accountability of the hearing officers within the "administrative system."[50] The House substitute, which became Act 103, separated the single workers' compensation commission into a workers' compensation appellate commission and a workers' compensation Board of Magistrates.[51]

---

[46] SB 7, § 852.

[47] SB 7, § 274(7).

[48] SB 7, § 273(c).
One member would be appointed by each of the majority and minority members of each house of the Legislature, and three by the Governor.

[49] Substitute for SB 7 (S-4), §§ 274, 275.
Appeals were to be heard by an appeal panel which could not include the commissioner who had heard the evidence.

[50] Senate Analysis Section, Analysis of SB 7 as reported out of committee (S-4), p 5 (May 22, 1985).

[51] House Substitute for SB 7 (H-4), §§ 213, 274.

### III

The Civil Service Commission and the referees contend that the Legislature, in removing the workers' compensation hearing officers from the classified service, defied the findings and recommendations of Professor St. Antoine, who saw no reason for major structural changes at the hearing officer level.[52] The reforms he recommended were all embodied in the first draft of the amendatory legislation which left the hearing officers in the classified service.[53]

It is argued that none of the referees' functions or duties are assigned to the board. The sole purpose was to remove the referees from the civil service system. The magistrates are no more a board than were the referees. The legislation does not take the initial decisionmaking function from the classified referees and give it to the board. It keeps that function with the individual hearing officers who act individually and not collectively.[54]

The Civil Service Commission and the referees observe that the terms "board" and "commission"

[52] See n 33 and accompanying text.

[53] See ns 45-48 and accompanying text.

[54] The Civil Service Commission and the referees additionally contend that legislative bad faith is inferable from the transfer of functions heretofore performed within the classified civil service to magistrates politically appointed outside of the classified service:

"As a general rule, where positions are purported to be eliminated and incumbents laid off, and thereafter identical or similar positions are re-established and the positions filled by others not entitled under the civil service law and rules to such employments, the courts will not hesitate to order re-employment of the laid off employees." Kaplan, Civil Service, p 215.

It is argued that this principle has been recognized in Michigan. The referees cite *Smith v Flint City Comm*, 258 Mich 698, 701; 242 NW 814 (1932); *Owen v Detroit*, 259 Mich 176, 177; 242 NW 878 (1932). They further argue that courts look through the argument that it is a "position" that is being abolished rather than the employee who is being discharged, for abolition of the job entails displacement of those who have been qualified for it, learned its requirements, gained specialized experience in performing it, and would be forced to alter their working lives and careers.

have been said to be synonymous,[55] and to mean a "body of persons" charged with a specific function or with the transaction or superintendence of some particular business.[56]

It is further observed that the referees perform functions that are not significantly different from those of federal administrative law judges.[57] The referees argue that nothing in the act suggests that "all thirty 'magistrates' are to hear cases *en banc* or *en masse* to preside over each hearing in the interests of 'economy' or 'administrative efficiency.' The decisive function remains personal and essentially a solitary responsibility. It is not a function of any 'board' or 'commission.' "

The act in many sections speaks of action to be taken by "a" or "the" workers' compensation magistrate.[58] These specific provisions indicate, it is

---

[55] The referees cite 1 Oxford English Dictionary 239; 2 Oxford English Dictionary 681 (Compact ed 1971).

[56] The referees cite *State ex rel Johnson v Independent School Dist No 810*, 260 Minn 237, 243-245; 109 NW2d 596 (1961).

They also cite *People v Maynard*, 15 Mich 463, 468, 472, 473 (1867). In *Maynard*, this Court said that the powers of a board of supervisors may not be exercised by "single persons." The Court also said: "Among the necessary incidents to a county are subdivisions in which the electors can lawfully vote, and townships whose supervisors conjointly may exercise the legislative and administrative powers of the corporation." Justice Cooley, concurring, added that "the term 'board,' in its derivation as well as in its ordinary use, indicates a deliberative body, composed of more than one person."

[57] Federal administrative law judges are included in a civil service system. 5 USC 3105.

It appears that workers' compensation administrative law judges are civil service employees in twelve states and are not in seventeen states. These statistics were provided by the chief administrative law judge for Minnesota, who is conducting a survey under the auspices of the Executive Committee of the National Conference of ALJs and the Commission on Standards of Judicial Administration. Both are part of the Judicial Administration Division of the American Bar Association.

[58] MCL 418.206(3); MSA 17.237(206)(3), MCL 418.356; MSA 17.237(356), MCL 418.375; MSA 17.237(375), MCL 418.835; MSA 17.237(835), MCL 418.841; MSA 17.237(841), MCL 418.847; MSA 17.237(847), MCL 418.851; MSA 17.237(851), MCL 418.861a; MSA 17.237(861a), MCL 418.863; MSA 17.237(863).

argued, that the work of the magistrates is not a collegial or collective enterprise. The hearing is not before a board, commission, or other collective body, but before a single magistrate.

## IV

The circuit judge agreed with the characterization advanced by the Civil Service Commission and the referees. He entered a judgment declaring that § 213 of Act 103, establishing the Board of Magistrates, is unconstitutional. The opinion filed by the judge stated that on consideration of this Court's decision in *Case v Liquor Control Comm,* 314 Mich 632; 23 NW2d 109 (1946), he had concluded that the board of magistrates was "not a body of importance and dignity.[59] It is merely a tool, an artifice whose sole purpose is to legitimize the removal of positions from the classified service."

The judge observed that the magistrates would "operate almost exclusively as individuals. Essentially, they are administrative law judges who individually conduct hearings." "[T]heir duties and functions are substantially similar to those of their predecessors, the hearing referees who are classified employees." The magistrates have no duties and functions which they "are *required* to discharge as a collective body," although they "are *authorized* to act as a collective body" in employing a support staff and promulgating rules on administrative hearing procedures. "In comparison to the many and important functions discharged by the magistrates individually, these two responsibilities, which are of a type commonly entrusted to single officials, and which *may* be corporately

---

[59] See text following n 91 for quotation from this Court's opinion in *Case v Liquor Control Comm,* 314 Mich 632; 23 NW2d 109 (1946), where the phrase "importance and dignity" appears.

undertaken by the magistrates, are insignificant. In the opinion of this Court, they fall far short of conferring importance and dignity and are insufficient to constitute a proper board." (Emphasis in original.)

## V

It does not ineluctably follow from the truisms that magistrates are expected to perform, individually and not collegially or collectively, their principal function of hearing and deciding cases, that boards and commissions ordinarily have two or more members and make their decisions collectively, and that the magistrates were organized in a board to remove workers' compensation hearing officers from the civil service system, that the Legislature acted unconstitutionally in creating a board of hearing officers to perform a function formerly performed by persons covered by civil service.

To be sure, boards or commissions are generally composed of two or more persons, and thus the common understanding of most people would indeed be that a board or commission is composed of two or more persons. But that only replicates the truism that *ordinarily* boards or commissions are composed of two or more persons. It does not follow that a board or commission cannot be composed of one person or that all members of a board or commission must act collectively in every matter or in some matters.

## A

In 1940, when the civil service amendment was added to the constitution, there were two commissions, the Racing Commission and the Corporation and Securities Commission, that were essentially one-person commissions.

The Racing Commission was composed of one person, the Racing Commissioner, who was appointed by and served at the pleasure of the Governor.[60]

The Corporation and Securities Commission was essentially a one-person commission.[61] The one commissioner of that commission was appointed for a fixed term by the Governor.[62]

The Racing Commissioner, for the Racing Commission, and the Corporation and Securities Commissioner, for the Corporation and Securities Commission, acted alone. There was no decisionmaking by either commission through persons acting collegially as members of a collective body or entity.

Just as there can be a one-person commission, there can be a one-person board. The Business Corporations Act provides that a board of directors "shall consist of 1 or more members."[63]

The civil service commission, at a meeting on March 6, 1941, adopted an "order" declaring that

[60] The commission was created pursuant to 1933 PA 199, 1948 CL 431.1 et seq.; MSA 18.941 et seq. There was one Racing Commissioner and no other member of the commission. The act spoke in terms of a "commissioner" and a "commission" and provided that "[t]he term 'commissioner' and 'commission' as used in this act shall be construed to mean the Michigan Racing Commissioner." 1948 CL 431.1; MSA 18.941. The 1933 act was replaced by 1959 PA 27, MCL 431.31; MSA 18.966(1).

[61] The commission was created pursuant to 1935 PA 13, 1948 CL 451.1 et seq.; MSA 19.781 et seq., MCL 451.1; MSA 19.781.

[62] The Corporation and Securities Commissioner was empowered to appoint not more than three deputy commissioners who were authorized "to conduct hearings in the several matters submitted to the commissioner for his determination, and to make report of such evidence as may be submitted to them, together with their conclusions and recommendations, to the commissioner for his action . . . ." MCL 451.2; MSA 19.782. It was further provided that the deputy commissioner "shall likewise have power and authority to perform such other duties as may be delegated to them by the commissioner."

They carried out their hearing function as individuals and not as, or members of, a collective entity.

[63] MCL 450.1505; MSA 21.200(505). This is not an unusual provision. See O'Neal, Close Corporations, § 3.13, n 1.

among the boards and commissions "exempt" from the state civil service are the one-member Corporation and Securities Commission and the one-member Racing Commission.[64]

## B

The Workers' Compensation Appeal Board no longer carries out its function acting as a collective body or entity.

The primary, indeed the only, function of the WCAB—like the employment security appeal board/board of review[65]—is adjudicative, to hear and decide appeals from orders of referees and the director[66] arising out of claims for workers' compensation filed with the bureau. In discharging that function, the fifteen-member WCAB sits in panels of three. Since 1980, the decision reached by a majority of the three members assigned to hear an appeal is the final decision of the WCAB.[67]

[64] The dissenting opinion indicates that the Racing Commission and the Corporation and Securities Commission may have been excepted from civil service as heads of departments and not as members of commissions. *Post*, pp 652-653, n 25. That they may have been excepted as heads of departments does not preclude their also having been excepted as members of commissions.

The 1963 Constitution provides that a board or commission may head a principal department of state government (see n 1). That does not negate the exception from civil service of members of boards or commissions that head principal departments. It rather indicates that the members of such a board or commission are excepted because of their membership in the board or commission and not as the head of a principal department—it is the members who are excepted, not the board or commission. (The Civil Service Commission and the Civil Rights Commission head principal departments.)

[65] See ns 84 and 85 and accompanying text.

[66] MCL 418.255; MSA 17.237(255).

[67] 1980 PA 357, MCL 418.261; MSA 17.237(261).

The number of members of the WCAB was increased from three (1955 PA 62) to five (1964 PA 266) to seven (1965 PA 139; 1969 PA 317). After the 1965 amendment, the members sat in panels of four. If four members concurred in the result, it was final; if there was disagreement, the matter was required to be reviewed by the full board.

In 1973, the number of members was increased to eleven who sat in

Thus, two of the fifteen members of the WCAB decide the appeal, and their decision then becomes the decision of the WCAB without consultation or deliberation with, or participation or voting by, the other twelve members of the WCAB. There is no decisionmaking by the entire board acting as an entity.

Act 103 provides that matters now pending before the WCAB shall be heard by a panel of two members of the WCAB and that their decision shall be the final decision of the WCAB. Only if they cannot reach a decision is a third member to be designated, in which event the decision of the third member shall be controlling and shall be considered to be the final decision of the WCAB. Act 103 does not in terms require that the third member participate in a "collective" decision.[68]

If Act 103 were held to be unconstitutional, the WCAB would continue to act in panels,[69] now of two, or on occasion three, and the decision of a majority—two of a three-member panel—would continue to constitute the decision of the fifteen-member WCAB. The WCAB would continue to perform its only function, not as a collective body or entity, but in panels of two or three.

panels of five. Further review by the entire board was obtainable only in the unusual case where a majority of the five could not agree; otherwise the decision of a majority was the final decision of the board (1973 PA 73).

In 1978, the number of members was increased to fifteen who sat in panels of three. If a majority of the three were unable to agree, the matter was required to be reviewed by the entire fifteen-person board.

In 1980, the provision for review by the entire board was eliminated. Act 103 provides for such review; see n 23 and accompanying text.

[68] MCL 418.261; MSA 17.237(261).

[69] MCL 418.261; MSA 17.237(261) (see n 68) is not tie barred (1985 PA 103, § 4) and thus survives without regard to whether this Court decides that § 213 of Act 103 is unconstitutional.

## C

Before the WCAB was created in 1955,[70] the work thereafter and now done by the WCAB was done by the four-member Workmen's Compensation Commission,[71] the successor of the Industrial Accident Board,[72] with the aid of deputies who were grandfathered as referees when that office, at the time the WCAB was created, was established.[73]

The original 1912 enactment provided that a claim for workers' compensation would be heard by a "committee of arbitration" consisting of an employer's and employee's representative and one member of the Industrial Accident Board; unless a claim for review was filed, the committee's decision would stand as the decision of the Industrial Accident Board.[74]

By 1919, the act had been amended to state that the board could name one of its employees, called a deputy member, to sit as a third member of the committee of arbitration.[75] The decision of the committee, none of whom would then be members of the board, would stand as the decision of the board unless a claim for review was timely filed.[76]

In 1921, the committee of arbitration was eliminated except in name. If the parties could not agree, the hearing was to be conducted by one

---

[70] 1955 PA 62, MCL 408.9; MSA 17.6(15).

[71] 1947 PA 357, MCL 408.1; MSA 17.6(7).

[72] 1912 (1st Ex Sess) PA 10.

[73] 1955 PA 62, MCL 408.7; MSA 17.6(13).

[74] 1912 (1st Ex Sess) PA 10. 1915 CL 5460, 5461.

[75] 1919 PA 64, 1929 CL 8459.
The workers' compensation act had been theretofore amended to permit the board to appoint two deputy commissioners who held office "during its pleasure" who were authorized under the direction of the board to conduct a hearing or arbitration in the same manner and with like effect as if done by a member of the board. 1915 PA 171; 1915 CL 5472. This provision was amended by 1919 PA 64; 1929 CL 8459, to permit the commission to appoint "sufficient deputy members" to enable it "efficiently to administer the law."

[76] 1919 PA 64, 1929 CL 8447.

person, either by a member or deputy member. "The member or deputy member so designated shall be known as a committee of arbitration wherever the phrase 'committee of arbitration' is used in the act." The decision of the member or deputy member would, as before, stand as the decision of the board unless review by the board[77] or commission[78] was timely sought.

Accordingly, from 1912 until 1955—for over forty years—unless review of a workers' compensation hearing officer's decision was timely sought, the decision of a single member or employee of the board or commission would stand as the decision of the full board or commission without, consequently, any decisionmaking by the board or commission as a collective body or entity.

## D

The Liquor Control Commission has been organized as a unified commission with a hearing division, which does not act collectively, and an appellate division, which does, for nearly thirty years, since 1957. There are two hearing commissioners and three administrative commissioners.[79]

---

[77] 1921 PA 60, 1929 CL 8445, 8446, 8447.

In 1943, the references to the Industrial Accident Board and the committee of arbitration were eliminated. However, until 1955 (see n 75), the decision of an employee (a deputy member) would stand as the decision of the board or commission unless review was timely sought. 1943 PA 245, 1948 CL 413.6, 413.7, 413.8; MSA 17.180, 17.181, 17.182.

[78] See 1921 PA 43 and 1947 PA 357, 1948 CL 408.1; MSA 17.6(7), transferring the powers of the Industrial Accident Board to commissions.

[79] 1945 PA 133, creating the Liquor Control Commission Board of Hearing Examiners, was repealed by 1957 PA 264. The 1957 act carried forward the concept embodied in the 1945 act by enlarging the number of liquor control commissioners from three to five. All five members of the commission are appointed by the Governor with the advice and consent of the Senate. "Two . . . shall be designated by the chairman as hearing commissioners" to hear violation cases and to perform other functions and duties. The other three, shall "act as

The hearing commissioners replaced the members
of the Board of Hearing Examiners established
under the 1945 act held to be excepted from civil
service in *Case,* discussed in Part VI.[80] An adminis-
trative appeal may be allowed in the discretion of
the three administrative commissioners who for
this purpose are constituted an appeal board.[81]

The hearing commissioners, as did the hearing
examiners, hear individually and not collectively

an appeal board to the decisions rendered by the hearing commission-
ers." MCL 436.5; MSA 18.975.

As originally enacted in 1957, the statute did not describe the
hearing officer commissioners as "hearing commissioners" or the
other three commissioners as "administrative commissioners." The
1957 act stated simply that the "commission shall consist of 5 mem-
bers," and that two of these members "shall hear cases and render
decisions," and the remaining three commissioners "shall act as an
appeal board."

The statute took its present form in 1976 PA 31, providing that two
commissioners shall be designated by the chairman as hearing com-
missioners, and the remaining three shall be designated as adminis-
trative commissioners. The three who are not hearing commissioners
"have the responsibility for administering the provisions of this act
relating to licensing, purchasing, enforcement, merchandising, and
distribution." It is further provided: "The responsibilities of the 5-
member commission shall be the administration of the provisions of
this act which have not been specifically delegated to either the
hearing commissioners or the administrative commissioners in this
section." It might be argued that this latter provision indicates that
the Liquor Control Commission is responsible for performing at least
some of its primary functions as a collective body. It does not appear,
however, what function, if any, of the commission would not be
included within either "licensing, purchasing, enforcement, merchan-
dising, and distribution" or hearing "violation cases" and appeals
therefrom. Absent any evidence that there is some function so per-
formed as a collective body, there is no basis for concluding that a
primary function of the commission is required to be performed or
has been performed by the five members as a collective body.

In all events, the hearing function was and is performed individu-
ally by hearing commissioners who replaced the members of the
Board of Hearing Examiners who also acted individually.

[80] See n 79 and Part VI. The power of a liquor control hearing
officer was expanded by the 1957 act; the members of the Board of
Hearing Examiners were empowered under the 1945 act only to
"report their findings to the commission for decision"—the hearing
commissioners were empowered by the 1957 act not only to "hear
cases" but also to "render decision." MCL 436.5; MSA 18.975.

[81] See n 79.

complaints seeking license suspension or revoca-
tion. Since 1945, either a member of the Board of
Hearing Examiners or (since 1957) a member of
the commission described (since 1976) as a hearing
commissioner has acted individually in hearing
complaints against licensees. There has been no
decisionmaking either by the board or the commis-
sion as an entity at the hearing level. The only
collective action occurs if and when an appeal is
allowed by the appeal board. If an appeal is al-
lowed, the decision of two, a majority of the ad-
ministrative commissioners, stands as the decision
of this five-member commission.

If the workers' compensation hearing function
had been reorganized, in the manner of the Liquor
Control Commission, as a unified commission, with
a hearing division and an appellate division,[82]
there would then be as much collective decision-
making at the hearing level by the entire unified
commission as there was between 1912 and 1955
in workers' compensation cases where, after deci-
sion by the member or deputy member who con-
ducted the hearing, no further administrative re-
view was sought. And there would then be as
much collective decisionmaking at the appellate

[82] The asserted deficiency in Act 103, namely that there would not
be collective decisionmaking by the "entire board or commission or
through panels" (see text accompanying n 86), could, it would appear
—consistent with the practice in hearing workers' compensation
claims (see text accompanying ns 70-78) over the forty-year period,
which included 1940, when the amendment concerning the civil
service system was added to the constitution with an exception for
members of "boards and commissions," (Const 1908, art 6, § 22; now
Const 1963, art 11, § 5)—have been avoided or rectified by simply
creating a single unified commission, as was done in the first full
Senate revision of the bill that became Act 103 (see n 47 and
accompanying text), of say thirty-seven members with two divisions,
an appellate division (seven members) and a hearing division (thirty
members). Then some of the primary functions of the unified commis-
sion would be discharged collectively through panels of the appellate
commission.

level by the entire unified commission as has obtained since 1973, when the wcab began to sit in panels of five, and 1980, when it began to sit in panels of three.

Surely it is not a constitutional difference—only a difference in form, not substance—that two separate bodies, the Board of Magistrates and the appellate commission, were created rather than a single unified commission, as the Liquor Control Commission, composed of two divisions—a hearing and an appellate division.[83]

E

Also stated by the Civil Service Commission to be exempt at its March 6, 1941 meeting was the Unemployment Compensation Commission and the Unemployment Compensation Appeal Board created by a 1936 act that was amended in 1937.[84]

The 1936 act provided for an Unemployment Compensation Commission composed of four members appointed by the Governor and a separate appeal board composed of three persons to be appointed by the commission. In 1937, the power to appoint the members of the appeal board was vested in the Governor. In 1977, the adjudicative function of the appeal board was transferred to a new appellate tribunal, named the Employment

[83] The trial court of general jurisdiction and the intermediate appellate court in New York is organized as a unified court. There is one court composed of over 350 elected justices, most of whom are trial justices, some of whom serve by gubernatorial appointment on four appellate divisions of the court with a discretionary appeal to the Court of Appeals, New York's highest court. NY Jud Law, § 70 *et seq.* (McKinney).

[84] 1936 (Ex Sess) PA 1, 1948 CL 421.3, 421.35; MSA 17.503, 17.537, 1937 PA 347, 1948 CL 421.35; MSA 17.537.

The act was subsequently amended a number of times, but there was no substantive change until 1977 when there was created a board of review composed of five members, also to be appointed by the Governor, to replace the appeal board. 1977 PA 52; MCL 421.35; MSA 17.537.

Security Commission Board of Review, composed
of five persons appointed by the Governor.[85]

It appears that the only function of the employ-
ment security appeal board/board of review was
and is adjudicative. Thus, before the 1940 civil
service amendment was added to the constitution,
a board had been created by the Legislature that
had no administrative and only adjudicative func-
tions, and that board had been recognized by the
Civil Service Commission as exempt in 1941.

F

The dissenting opinion would require as a pre-
condition to exception from civil service that a
statute creating a board or commission require
that the members of the board or commission
"perform some of their primary decisionmaking
functions collectively either as an entire board or
commission or through panels of the bodies."[86] It
thus appears that we all agree that a board or
commission need not act as a collective entity in
every or indeed any matter. Our disagreement is
thus limited to whether some collective decision-
making is required by a panel of say two or three
members of a fifteen- or thirty-member board or
commission.

Once it is decided that a board or commission
need not act as an entity through the vote of a
quorum of the whole board or commission, there is
no reason in precedent or logic for seeking to
retain the form of collective action by insisting
that a board or commission act at least in panels
of two or more. The notion that collective decision-
making is required flows from the concept that a
board or commission must act as a collective body.
There is no basis for drawing the line at two

[85] *Id.*
[86] *Post,* p 654.

members rather than one once it is recognized that the exception, in Const 1963, art 11, § 5, for members of boards or commissions does not require collective action by the entire entity acting as an entity. Establishing a collective decisionmaking criterion and announcing that it is satisfied when two members of a fifteen-member board agree would be incongruous.

## G

In sum, the Board of Magistrates is composed of more than one person; it is composed of thirty magistrates.

A number of gubernatorially appointed boards and commissions—(i) the Industrial Accident Board, subsequently named the Workers' Compensation Commission, now the Workers' Compensation Appeal Board; (ii) the Board of Hearing Examiners, and subsequently the Liquor Control Commission; (iii) the Racing Commission; and (iv) the Corporation and Securities Commission—and countless corporate boards, have acted either on the decision of one person or on the decision of less than a majority of a quorum of the whole board or commission.

Three boards or commissions, the Industrial Accident Board, subsequently the Workers' Compensation Commission, the Racing Commission, and the Corporation and Securities Commission, acted—before the 1940 amendment to the constitution adding the civil service provision—on the decision of one person.

The sole function of two boards, the Unemployment Compensation Commission Appeal Board (created before 1940), now the Employment Security Commission Board of Review, and the Workers' Compensation Appeal Board, was adjudicating claims of workers seeking compensation.

The WCAB no longer carries out its function of adjudicating particular claims as a collective body or entity, and would continue to act in panels without regard to whether § 213 of Act 103 were to be declared unconstitutional.

## VI

In *Case v Liquor Control Comm, supra,* this Court considered a challenge to the constitutionality of 1945 PA 133 which created a Board of Hearing Examiners for the Liquor Control Commission. There were three members of the board who were appointed for six-year terms by the Governor, with the advice and consent of the Senate. Members were removable by the Governor for misfeasance, malfeasance, and nonfeasance.

The act required the Liquor Control Commission to file a complaint with the board whenever a license was to be either suspended or revoked, and required the board to conduct a hearing limited to the facts and law and rules and regulations of the commission. The findings of the board, to be based on the facts adduced at the hearing and the law and the rules and regulations of the commission, were required to be reported to the commission for decision. It was provided: "Such board of hearing examiners *or any member thereof* shall conduct hearings on questions referred to the board by the commission, under such rules and regulations as the commission may establish." (Emphasis supplied.)[87]

---

[87] "Sec. 5a. Same; board of hearing examiners. There is hereby created a board of hearing examiners to consist of 3 members to be appointed by the governor, by and with the advice and consent of the senate, for terms of 6 years each . . . . Members of the board may be removed by the governor for misfeasance, malfeasance and nonfeasance in office. . . . Such board of hearing examiners or any member thereof shall conduct hearings on questions referred to the board by

This Court said "[i]f there is any invalidity in [the 1945 act], it must appear so clearly as to leave no room for any reasonable doubt that it violates the Constitution, for every reasonable presumption and intendment must be resolved in favor of the constitutionality of the act. *Cady v City of Detroit,* 289 Mich 499 [286 NW 805 (1939)]; *In re Brewster Street Housing Site,* 291 Mich 313 [289 NW 493 (1939)]."[88]

The Court first rejected the claim that the creation of the Board of Hearing Examiners infringed on the prerogatives of the Liquor Control Commission under the constitution. Because the Board of Hearing Examiners merely made recommendations which the commission had the right to accept or refuse, the Court saw no infringement on the commission's prerogatives.[89]

The Court then rejected the Attorney General's challenge to the 1945 act based on the 1940 civil service amendment to the 1908 Constitution.[90] The Attorney General had argued that "the legislature

the commission, under such rules and regulations as the commission may establish. The examiners shall report their findings to the commission for decision. Each member of the board is authorized to examine witnesses and administer oaths. . . . In all instances when a license is to be either suspended or revoked the commission shall cause a complaint to be filed with said board whereupon said board shall conduct a hearing limited to the facts and law and rules and regulations of the liquor control commission as specified in said complaint." 1945 PA 133; 1948 CL 436.5a.

[88] *Case, supra,* p 638.

[89] The board, said the Court in *Case v Liquor Control Comm, supra,* pp 639-640, did not have the power to suspend or revoke a license and was "merely a fact-finding board which makes its findings to the commission" which "retains complete power" to suspend and revoke the licenses and to "accept or refuse to accept the findings of the board." There was no unconstitutional delegation of the commission's power under the constitution (Const 1908, art 16, § 11, now Const 1963, art 4, § 40) to exercise complete control of the alcoholic beverage traffic to the Board of Hearing Examiners. The hearing before the board was merely ministerial, the board having but limited duties.

[90] See Const 1908, art 6, § 22, which excepted "members of boards and commissions."

may not add [to the constitutional language] by
the use of tags or labels; calling the examiners
created in [the 1945 act], a 'board' does not take
them out of civil service," and had further argued
that the board of examiners was "ancillary to the
Liquor Control Commission" and not an indepen-
dent "agency or unit of government subordinate to
the governor" but rather part of and under the
"direction and control" of the Liquor Control Com-
mission.[91]

The opinion, after noting that the members of
the board were appointed by the Governor, their
salary, term of office, and the limited grounds for
removal, concluded that members of the board
were excepted from civil service because they were
members of a board or commission. The Court said
that the Legislature had

> created a *board of importance* and in language
> that showed that the appointment of mere employ-
> ees was not contemplated, but an additional auxil-
> iary body to assist the commission. The mere
> labeling of a body of employees as a board would
> be insufficient, but that was not the legislative
> intent as seen by the wording of the act. It was to
> be a *real board* of hearing referees which was to
> be *independent* of the commission, but its findings
> would not bind the commission. We believe that
> the creation of a body of such *importance and
> dignity,* and characterized by the legislature as a
> board, as a matter of fact created a board which is
> expressly excepted by the civil service amendment.
> Cases to the contrary cited by the attorney general
> bear some analogy but refer to employees and not
> to a board of this character. We find that the
> board was properly authorized, and that they have
> the constitutional power to act as an auxiliary, a
> fact-finding body; that hearings must be had before

[91] See records and briefs, *Case v Liquor Control Comm, supra,*
Attorney General's supplemental brief.

the board when created, but the final decision rests with the commission. If the commission acts capriciously, fraudulently or illegally, certiorari is the remedy as provided by the act. [*Case v Liquor Control Comm, supra,* pp 641-642. Emphasis supplied.]

The dissenting opinion in the instant case states that, while the statute construed in *Case* authorized the board or any member thereof to conduct hearings on questions referred to the board by the commission, "in instances where the commission filed a complaint against a licensee, the statute provided that the *board* should hold a hearing. Individual members of the board were not authorized to hold such hearings. Hence, the Board of Hearing Examiners was required by statute to conduct hearings on complaints filed by the Liquor Control Commission as a collective entity."[92] (Emphasis in original.)

The purpose of the Board of Hearing Examiners, as stated in *Case,* was to address the "evil in having the liquor commission make the complaint and then take testimony and make the final decision. The Legislature wanted a board of hearing examiners to first take the testimony and make findings for the benefit of the commission" which would then make the decision.[93] The 1945 act was a limitation on the authority of the Liquor Control Commission. The act clearly stated that the "board of hearing examiners *or any member thereof* shall conduct hearings on questions referred to the board by the commission . . . ." (Emphasis supplied.)[94] The only kinds of questions that the commission was required to submit to the board for

[92] *Post,* pp 646-647.

[93] *Case v Liquor Control Comm, supra,* p 640.

[94] 1945 PA 133, 1948 CL 436.5a; MSA 18.975(1). See n 87 for text.

hearing were those involved in a complaint seeking suspension or revocation of a license. There is no evidence that any other kind of question was ever submitted by the commission to the board for hearing.

The practical construction of the act by the commission and the board, embodied in administrative regulations,[95] was that any member of the board could conduct a hearing on a complaint against a licensee seeking suspension or revocation of a license. In *Napuche v Liquor Control Comm,* 336 Mich 398, 401; 58 NW2d 118 (1953), this Court said that Napuche's license was suspended follow-

---

[95] The regulations promulgated by the commission confirm that the hearing was and is conducted by a single hearing examiner or commissioner.

Currently, 1979 AC, R 436.1909, promulgated in 1977 AACS, R 436.1901, provides that "[a] hearing commissioner shall conduct the violation hearing on the complaint." 1979 AC, R. 436.1917 provides that a "licensee aggrieved by an order of a hearing commissioner . . . may request a violation appeal hearing" and that an appeal shall be heard by the violation appeal board consisting of three administrative commissioners. Unless an appeal is taken and the appeal board, in its discretion, grants an appeal, the order of the hearing commissioner is not subject to further administrative review · and is subject only to judicial review.

These rules superseded 1960 AACS, R 436.701. The 1960 rules stated that "the commissioner shall conduct the hearing" and spoke of the findings and decision of "the commissioner." Again, it is clear that decisions were made individually and not collectively.

The 1960 rules superseded 1954 AC, R 436.461 *et seq.,* which were promulgated under the authority of the 1945 act. See Michigan Administrative Code 1954. They were promulgated as 1947 ACS, No 11, p 25, and 1948 ACS, No 14, p 6, in 1947 and 1948. These rules stated that the complaint shall be filed with the Board of Hearing Examiners by the commission. It is stated that "[t]he board of hearing examiners or any member thereof shall conduct the hearing . . . ." That the hearing before the board or any member thereof was of "a complaint against a licensee" appears in subparagraph K of R 436.461 which sets forth a "form of notice to licensees," which form states that the "[c]ommission has caused a complaint to be filed with the Board of Hearing Examiners alleging a violation of the laws of the state of Michigan and the regulations of the commission with respect to the operation of your establishment" and that "[f]ailure to attend the hearing will result in immediate suspension of your license pending your appearance before said Board of Hearing Examiners, or the member thereof assigned thereto, in answer to the complaint."

ing a "hearing held before a hearing examiner on September 6, 1950, pursuant to the provisions of section 5a [creating the Board of Hearing Examiners] of the Michigan liquor control act, as added by PA 1945, No 133 . . . ."[96] (Emphasis supplied.) The record in *Napuche* substantiates that a hearing was conducted by one member of the Board of Hearing Examiners on the commission's complaint against Napuche, and that the member who conducted the hearing forwarded his findings to the commission without any consideration by any other member of the board or any action of or in behalf of the board other than the decision of the member of the board who conducted the hearing.[97]

---

[96] The opinion further stated: "Full opportunity was given to cross-examine and to make arguments to *the* examiner," and "[f]ollowing the hearing, *the* examiner dictated his findings which were then forwarded to the commission." (Emphasis supplied.) *Id.,* p 401.

[97] The complaint was filed July 28, 1950, by the Liquor Control Commission. It was signed by the executive secretary of the commission. It was captioned: "State of Michigan, Board of Hearing Examiners, Liquor Control Commission." It was dated July 28, 1950 and stated "Re: Christo P. Napuche, d/b/a Bronx Cafe," the address and kind of license. Then, "Complaint" and then "To the Board of Hearing Examiners, Michigan Liquor Control Commission," and then that the complaint concerned a sale to persons under the age of twenty-one years.

The transcript of the hearing on the complaint was captioned: "Board of Hearing Examiners, Michigan Liquor Control Commission" and was held on September 6, 1950, "Before: John B. Sosnowski, Hearing Examiner, LCC." The findings of the Board of Hearing Examiners were dated September 7, 1950, and the signature was set forth as follows: "John B. Sosnowski, Member, Board of Hearing Examiners."

The commission issued its decision on October 24, 1950, following a meeting of the commission on that day, suspending the license. On November 20, 1950, an attorney advised the commission that Napuche desired to "appeal the findings of the Commissioner to the Michigan Liquor Control Commission." The hearing was held before two members of the commission on January 4, 1951, and further testimony was taken. The commission affirmed the earlier decision.

A petition for a writ of certiorari was filed with the Wayne Circuit Court on January 22, 1951, which set aside the order of the commission on the ground "that the Commission that made the findings did not hear the evidence." The Attorney General filed a claim of appeal with this Court, which reversed and reinstated the decision of the commission.

The view that the 1945 act creating the Board of
Hearing Examiners required all three hearing
examiners to hear a routine complaint seeking the
suspension or revocation of a liquor license is
contrary to the purpose and clear language of the
act, the practical construction by the commission
and the board reflected in a reported decision of
this Court and in the administrative regulations,
and is inconsistent with the way hearings of this
kind are generally conducted in this country.[98]

## VII

The 1957 amendment, making Liquor Control
Commission hearing officers members of the Li-
quor Control Commission, came only two years
after the 1955 amendment designating the deputy
members of the workers' compensation commission
as workers' compensation referees.[99]

The difference in legislative approach in enact-
ing the 1955 workers' compensation and 1957
liquor control amendments indicates that the Leg-
islature chose to retain some hearing officers in
the civil service system and to remove others from

[98] A three-judge trial hearing is a rare exception. The United States
Code provided at one time for a three-judge hearing where the
constitutionality of a state or federal statute was challenged in the
federal court. 28 USC 2281, 2282. This provision is now limited to an
action challenging the constitutionality of the apportionment of con-
gressional districts or of any statewide legislative body. 28 USC 2284.
See 7 Moore's Federal Practice (Part 2), ¶ 65.16.

Three-judge courts have also been convened in the circuit court on
the rarest of occasions to consider complaints involving matters
regarded by the judges as raising important and novel questions of
law.

A hearing conducted by three hearing officers is unknown or so
rare that it is unknown. There may have been an occasional hearing
by two or more hearing examiners in a particularly difficult, novel, or
important case. It is inconceivable that a hearing on a matter as
routine as whether to suspend or revoke a liquor license has ever or
would ever be conducted by more than one person.

[99] See n 73.

the system by organizing them in a board or commission subject to gubernatorial appointment for fixed terms.

The referees question the precedential value of this Court's decision in *Case,* holding that Liquor Control Commission hearing officers may be removed from the civil service system, pointing out that their collective-decisionmaking argument was not advanced in *Case* and therefore was not considered. The rule is indeed well-established that a point not briefed and considered is not decided.[100] *Case* nevertheless—because it is the only decision addressing the meaning of the words "boards and commissions"—has been the focal point of arguments of counsel in this appeal.

This Court in *Case* obviously was concerned with whether the Board of Hearing Examiners there challenged was a "proper" or, to use the Court's term, "a real board of hearing referees." It saw the problem of labeling "a body of employees as a board." While the collective-decisionmaking argument was not there briefed, considered, or decided, the justices surely knew and understood that the hearing examiner members of that board would act alone.

Be that as it may, what this Court did in *Case* is as important as what it said. What it did was to sustain the 1945 legislative decision to remove, by organizing them in a board, liquor control hearing examiners from the operative effect of the 1940 amendment to the constitution concerning the state civil service system.

In 1961, the Constitutional Convention met. The delegates were presumably aware of this Court's

---

[100] *Allen v Duffie,* 43 Mich 1, 11; 4 NW 427 (1880); *Ajluni v West Bloomfield Bd of Ed,* 397 Mich 462, 465; 245 NW2d 49 (1976); *In re Apportionment of State Legislature—1982,* 413 Mich 96, 113-114; 321 NW2d 565 (1982).

decision in *Case* which in effect held that a hearing officer need not be included in the civil service system.[101] Nevertheless, the words "boards and commissions" were not modified in the 1963 Constitution to preclude the inclusion of a hearing officer—who acts individually and not collectively —as a member of a board or commission.

## VIII

If collective decisionmaking were the determinative criterion, the Legislature could readily create a board of hearing officers whose individual decisions would become "collective" when approved by another hearing officer, with a third to be assigned to the panel if they could not agree.[102] Similarly there could be "collective" action by "boards" of parole or probation officers or social workers. Clearly something more or other than collective decisionmaking is required to constitute a real or true board or commission.

*Case* spoke of "importance," "dignity," and "independence" to distinguish a "real board" from a "body of employees" merely labeled as a board.

Act 103 provides that the Board of Magistrates is created as an "independent body" and an "au-

[101] "The delegates to the 1961 Constitutional Convention are presumed to have known and to have understood the meaning ascribed in these earlier decisions to the language of the 1908 Constitution. This language was retained by them in the 1963 Constitution without modification in response to the earlier decisions. Under well-established principles, it is not open to us to place a new construction on this language." *Bds of Co Road Comm'rs v Bd of State Canvassers,* 391 Mich 666, 676; 218 NW2d 144 (1974).

Similarly see *Co Road Ass'n of Michigan v Bd of State Canvassers,* 407 Mich 101, 121-122; 282 NW2d 774 (1979), and *White v City of Ann Arbor,* 406 Mich 554, 566; 281 NW2d 283 (1979).

[102] The WCAB, the members of which are excepted from the civil service system, makes decisions de novo on "cold" transcribed records without hearing or seeing live witnesses.

tonomous entity."[103] The members of the board are appointed by the Governor, like the members of most other boards or commissions. Their term of office is four years. That is the maximum term of office authorized under the constitution for a member of a board or commission.[104]

This Court sustained in *Case* the validity of the Board of Hearing Examiners because it perceived the role or function of the members of that board to be important and their status—appointment by the Governor, four-year term of office, and salary —to be dignified. The members of the Board of Magistrates established under Act 103 have a role or function of greater importance, and similarly are appointed by the Governor, will be comparatively well-paid, and have stature.

The magistrates, like the hearing examiners in *Case,* are not subject to removal except for cause.[105] In the discharge of their hearing function, the magistrates have as much or more independence, autonomy, and importance as the members of most other boards or commissions.

A

The Civil Service Commission and the referees argue that the magistrates will be performing the same duties—hearing particular cases—as have been performed by the referees. They reason that the position they now hold must therefore remain in the civil service system. Equally true, however, is that the magistrates will be performing the same function—deciding particular cases with a large measure of finality—as has been performed by the members of the WCAB, who are excepted from the civil service system.

[103] MCL 418.213; MSA 17.237(213).
[104] Const 1963, art 5, § 3.
[105] See n 16 and n 87.

This argument by the Civil Service Commission and the referees proceeds on the assumption that because the referees were granted civil service status, the position of workers' compensation hearing officer could not have been organized by the Legislature in a board of referees or hearing examiners. They also seem to be arguing that the referees have a vested right in the decisions that permitted referees to acquire civil service status that precludes the Legislature from creating a board or commission of hearing examiners for workers' compensation cases as it has done for Liquor Control Commission cases.

With the exception of the hearing commissioners of the Liquor Control Commission, who replaced the members of the Board of Hearing Examiners considered in *Case,* it has indeed been the practice in this state to provide hearing officers with civil service status. It is unclear to what extent that is a result of inertia or a thought-through decision for policy reasons.

It has been approximately fifty years since the growth of administrative law began to accelerate in the days of the New Deal. The proliferation of boards and agencies at the federal level was later paralleled at the state level. There followed a federal administrative procedures act[106] and subsequently state administrative procedures acts[107] with a requirement of a hearing in contested cases. The procedural guarantees provided by the federal and state constitutions[108] and these administrative procedures acts created a need for hearing officers at the administrative level in ever-increasing numbers.

[106] Administrative Procedure Act, June 11, 1946, ch 324, 60 Stat 237; 5 USC 1001. Now 5 USC 551.

[107] 1943 PA 88, 1948 CL 24.71 *et seq.;* MSA 3.560(7), now MCL 24.201; MSA 3.560(101).

[108] US Const, Ams V, XIV; Const 1963, art 1, § 17.

At the beginning of this process, the hearing officer was often an aide to the person or persons charged with making the decision. The aide relieved the person or persons charged with making the decision of the need to hear the evidence. After hearing the evidence, the aide prepared a report with proposed findings of fact and sometimes conclusions or proposed conclusions of law that would then be forwarded to the decisionmaker with or without a recommendation. Such persons were influential in the decisional process, but nominally at least did not make the decision.[109]

Hearing officers whose decisions are mere recommendations that are reviewable de novo might understandably be regarded as persons performing a function similar to that performed by other civil servants and hence as persons that should be included in civil service and thereby removed from the political process.

The decision of a workers' compensation magistrate will, however, stand as the decision of government, and will not be reviewable de novo. In this connection it is noteworthy that *Case* did not require that the decision be of that importance— the hearing examiner members of the Board of Examiners filed only findings without a recommendation—to justify placing employees of government performing that role in a separate board or commission and hence removed from the protection of civil service.

B

Since 1940, the Legislature has created at least nineteen commissions or boards to address particu-

---

[109] 3 Davis, Administrative Law (2d ed), §§ 17:1-17:17, 17:11, 17:14. *United States v Morgan,* 298 US 468; 56 S Ct 906; 80 L Ed 1288 (1936).

lar concerns.[110] It would be surprising if some
department of state government had not thereto-
fore addressed some of those concerns, and some
state employee with civil service status was not
charged with or had not exercised the responsibil-
ity of acting for the state in addressing those
concerns or some of them. Surely, the constitution-
ality of legislation creating a commission or board
could not be challenged by a civil servant on the
basis that the new agency will politicize the gov-

[110] *Department of Labor.* Commission on Agricultural Labor, 1968
PA 35, MCL 16.490; MSA 3.29(390), Commission for the Blind, 1978
PA 260, MCL 393.352; MSA 17.581(2), Construction Code Commission,
1972 PA 230, MCL 125.1503; MSA 5.2949(3), Construction Safety
Commission, 1974 PA 154, MCL 408.1018; MSA 17.50(18), Elevator
Safety Board, 1967 PA 227, MCL 408.807; MSA 17.495(7), Wage
Deviation Board, 1964 PA 154, MCL 408.385; MSA 17.255(5).

*Department of Natural Resources.* Air Pollution Control Commis-
sion, 1965 PA 348, MCL 336.13; MSA 14.58(3), Exposition and Fair
Grounds Council, 1978 PA 361, MCL 285.169; MSA 12.1280(59), Wa-
terways Commission, 1947 PA 320, MCL 281.502; MSA 3.534(2).

*Department of Commerce.* Boundary Commission, 1968 PA 191,
MCL 123.1002; MSA 5.2242(2), Mobile Home Commission, 1976 PA
419, MCL 125.1103; MSA 19.855(3).

*Department of Management & Budget.* Commission on Indian
Affairs, 1972 PA 195, MCL 16.711; MSA 3.547(101).

*Department of Licensing & Regulation.* Carnival Amusement Safety
Board, 1966 PA 225, MCL 408.653; MSA 18.484(3), *Collection Prac-
tices Advisory Board, 1974 PA 361, MCL 445.226; MSA 19.655(36),
*Board of Registration for Professional Community Planners, 1966
PA 218, MCL 338.1358; MSA 18.170(8), *Board of Forensic Polygraph
Examiners, 1972 PA 295, MCL 338.1705; MSA 18.186(5), *Board of
Foresters, 1955 PA 78, MCL 338.723; MSA 13.215(3), *Board of
Hearing Aid Dealers, 1966 PA 265, MCL 338.1454; MSA 18.276(4),
*Board of Horology, 1965 PA 201, MCL 338.1403; MSA 18.275(3),
*State Board of Marriage Counselors, 1966 PA 292, MCL 338.1037;
MSA 18.398(7), *Board of Examiners of Massage, 1974 PA 251, MCL
338.1857; MSA 18.360(7), Board of Physical Therapy, 1978 PA 368,
MCL 333.17821; MSA 14.15(17821), Board of Psychology, 1978 PA 368,
MCL 333.18221; MSA 14.15(18221), *Board of Examiners in Social
Work, 1972 PA 352, MCL 338.1753; MSA 18.365(3), Ski Area Safety
Board, 1962 PA 199, MCL 408.323; MSA 18.483(3), Toxic Substance
Control Commission (department unclear), 1978 PA 116, MCL
286.183; MSA 14.529(103).

*1980 PA 299, the Occupational Code, MCL 339.101 *et seq.;* MSA
18.425(101) *et seq.,* consolidates and reclassifies the laws regarding the
regulation of certain occupations and creates a board for each occupa-
tion and procedure for licensing.

ernmental effort to address the concern or will eliminate or reduce the civil servant's role in addressing that concern.

The issuance and revocation of some state licenses is the primary function of independent boards or commissions,[111] while other state licenses are issued by a bureau or division of a principal department of state government.[112] Where licensing is one of a number of functions of a department, or there are a considerable number of licenses issued by the department, there may be less supervision by the department head of the employees involved in the licensing process than of employees who serve on a board or commission that has no other business. The resultant increase in the power of civil servants who operate relatively free of supervision may lead to legislation creating a board or commission to increase political accountability. Surely a civil servant who formerly exercised considerable power could not be heard to say that the legislation creating the board or commission is unconstitutional either because this might politicize the licensing process or because he might, after years of faithful service and effort, be required to alter his role in government.

C

The civil service system relates to the executive branch of state government. The exceptions for employees of courts of record and employees of the Legislature are exceptions to take out of the civil service system and the control of the Governor,

---

[111] The licensing of architects and engineers, MCL 339.2002; MSA 18.425(2002), real estate brokers, MCL 339.2502; MSA 18.425(2502), and mobile home dealers, MCL 125.1103; MSA 19.855(3), are examples of licenses administered by a board or commission.

[112] Mechanics, Bureau of Automotive Regulation, Mechanic Certification Division, MCL 257.1308, 257.1309; MSA 9.1720(8), 9.1720(9); Pet shops, Director of Agriculture, MCL 287.333, 287.334; MSA 12.481(103), 12.481(104).

who appoints the members of the Civil Service Commission, employees of the other two separate branches of government, the judiciary and the Legislature. Similarly, to preserve the independence of state institutions of higher education from gubernatorial control, their employees are excepted. Persons in the armed forces of the state are excepted because they are not part of the *civil* service.[113]

Turning to the exceptions and exemptions in the executive branch, they appear to be generally characterized by policy-making. Positions filled by popular election, the heads (principal executive officers) of the not more than twenty departments are policy-making positions and by definition all the exempt positions in the principal departments are policy-making except for not more than one position in each department that is not required to be but may be policy-making.[114]

We all agree that however one characterizes the function of an administrative hearing officer or appellate tribunal member, it is clear that a real or true board or commission may be created to perform no function other than to adjudicate particular cases.

The Unemployment Compensation Commission Appeal Board was extant as a gubernatorially appointed board in 1937, three years before the civil service amendment was added to the constitution in 1940. The Civil Service Commission recognized in 1941 that the members of that appeal board were not covered by the civil service system. The employment security appeal board/board of review has and has had no function other than to adjudicate particular cases.[115]

---

[113] See n 1.

[114] *Id.*

[115] See ns 84 and 85 and accompanying text.

Similarly, the WCAB has and has had no function other than to adjudicate particular cases. It is thus clear that persons who have no function other than to adjudicate particular cases may be members of a board or commission that is excepted from the civil service system.

D

A board or commission is generally placed in charge of some business of the government. Whether a board or commission is "important" depends on the nature of the business, and the authority and power entrusted to it. The "dignity" of a board or commission relates to status or stature, as well as the importance of its business, authority, and power.

Members of boards and commissions are generally appointed by the Governor and sometimes by the Legislature. The members are accountable only to the appointing authority. They do not have a supervisor who can tell them how and what to do or decide. They are not part of a bureaucratic hierarchy, and hence are "independent."

A chairperson of a board or commission is not the superior of the other members. He can no more tell the other members how to vote or decide than the chief judge of a court could tell a Court of Appeals, circuit, district or probate judge how to decide. In the exercise of the decisional function, a member is not accountable to the chairperson.[116]

The members of the Board of Magistrates are appointed by, and are accountable only to, the Governor. They are not part of a bureaucratic hierarchy. In the exercise of the decisional func-

---

[116] The power of the chairperson to prescribe productivity standards gives him essentially the power this Court had granted to the chief judge of a multi-judge court. MCR 8.110. That power does not impinge on the independence or autonomy of Court of Appeals, circuit, district, or probate judges in multi-judge courts.

tion, they do not have a supervisor who can tell them how and what to decide. They are therefore "independent." The Board of Magistrates is created separate and apart from the appellate commission and the Bureau of Workers' Compensation, and accordingly is a separate autonomous entity within the Department of Labor.

The business of the Board of Magistrates and of the appellate commission is adjudicating controversies that arise under the workers' compensation law. Both the magistrates and the members of the appellate commission have the authority and power to decide those controversies—the magistrates at the hearing level and the members of the appellate commission on appeal. That business, authority, and power is of sufficient importance to justify the establishment of an independent board and commission for the purpose of discharging the governing function involved in resolving those controversies.

E

It is argued that Act 103 will politicize workers' compensation because the magistrates will serve for fixed terms and reappointment is dependent on gubernatorial favor.

The members of the WCAB have always served for fixed terms, with reappointment at the pleasure of the Governor. The decisions of referees were reviewable de novo by members of WCAB panels who serve only for a fixed term. Act 103 does not further politicize the workers' compensation system.

The constitution does not preclude the Legislature from requiring political accountability of per-

sons who make quasi-judicial decisions involving factfinding and law finding.[117]

The character of the decisions to be made by the magistrates are essentially the same as the quasi-judicial decisions made by the Employment Relations Commission, the Employment Security Commission Board of Review, the Liquor Control Commission, and numerous licensing boards. The members of all those agencies are gubernatorial appointees who serve for fixed terms and do not have civil service tenure.

A decision to revoke a liquor license or a physician's, veterinarian's, nurse's or other professional person's license, to grant or deny relief from an unfair labor practice, to award or deny unemployment compensation benefits, are decisions no less important than whether to award or deny workers' compensation benefits. Those decisions are made by members of boards and commissions whose appointment and tenure are subject to the political process.

F

The reports of some hearing officers state only findings or recommendations. Workers' compensation referees' decisions are, however, of greater importance because they are decisions, not solely findings. Absent an appeal to the WCAB, a judgment can be obtained from the circuit court enforcing a referee's decision.[118] Since 1975, when a referee's decision is appealed to the WCAB, seventy percent of any benefits awarded by the referee is

[117] Requiring political accountability in such decisionmaking is consistent with the provisions of the constitution that limit the terms of office of judges of all courts to six years and of the justices of this Court to eight years, and requires judges and justices to stand for reelection. Const 1963, art 6, §§ 2, 9, 12, 16.

[118] MCL 418.863; MSA 17.237(863), 1948 CL 413.13; MSA 17.187.

required to be paid during the pendency of the appeal.[119] Those are decisions of importance.

Workers' compensation hearing officers' decisions will henceforth have even greater importance. A magistrate's decision will no longer be reviewable de novo, and will be reviewable only for errors of law and a determination whether it is supported by substantial evidence on the whole record. A magistrate's decision on a claim seeking $2,000 or less is reviewable only for fraud or error of law in the discretion of the Court of Appeals or this Court.[120]

The legislative decision to constitute persons whose decisions have that importance as members of a board or commission who serve by gubernatorial appointment for fixed terms for the purpose of removing them from civil service and subjecting their appointment and retention to the political process is entirely consistent with constitutional principles that contemplate that persons exercising certain kinds of power shall or may be made politically accountable. That legislative decision making workers' compensation hearing officers more accountable in the political process was made in conjunction with the legislative decision to make their decisions more final and hence more important.

There is nothing pretextual about the increase in the power of workers' compensation hearing officers. There is a real increase in their power and in the importance of their decisions. The Legislature did not merely transfer the duties of the referees to the magistrates.

---

[119] See n 21.

[120] Claims of $2,000 or less are to be heard in a separate division of the board by a magistrate. The magistrate's decision in matters heard in that division is "final and nonappealable in the absence of fraud" as provided in the constitution. MCL 418.841(9); MSA 17.237(841)(9).

### G

Hearing officers who have the power to make decisions that become final unless appealed and whose findings are required to be considered conclusive on an appeal if supported by substantial evidence will have a function in state government similar in importance to that of the adjudicative appellate tribunals, the WCAB, and the employment security board of review. They will be deciding particular cases and controversies with a high degree of finality.

A primary purpose of Act 103 is to make the decisions of the magistrates final in most cases. While an appeal can be filed, it is intended that relatively few appeals will be successful. The number of members of the workers' compensation appellate tribunal has been reduced because the appellate role has been reduced from factfinder to a limited review for error. The decision of the magistrates will in most cases constitute the final decision. In making their decisions, the magistrates will be performing a function similar to that performed by the WCAB when the members of that board were thought to be performing a function of sufficient importance and dignity to be removed from the civil service system.

A magistrate, in hearing a workers' compensation claim, will have the same role as a judge when the judge acts as trier of fact in an action brought to enforce a right created by statute. A magistrate, like a judge, will find the facts with a large measure of finality and apply the law to the facts, and in so doing will often find it necessary to construe the workers' compensation act. In so construing the act, the magistrate may not have the guidance of reported appellate decisions. The function of a magistrate and of a judge and their authority and power in hearing a statutory claim

are essentially indistinguishable. The findings of
fact of a circuit judge are subject to reversal if
clearly erroneous (when the Court of Appeals or
this Court is left with the definite and firm convic-
tion that a mistake was made),[121] while a magis-
trate's findings of fact can be reversed on appeal
only if there is not substantial evidence on the
whole record to support the decision.

A magistrate's decision is reviewable by the
newly constituted appellate commission under pre-
cisely the same standard that applies to judicial
review of decisions of administrative tribunals
generally.[122] His decision has the same dignity and
importance in that regard as the decision of the
Employment Security Commission Board of Re-
view or the Employment Relations Commission,
which are subject to further review (by the circuit
court for the Employment Security Commission
Board of Review,[123] and by the Court of Appeals for
the Employment Relations Commission)[124] under a
substantial-evidence standard.

A magistrate's decision vis-à-vis the appellate
commission has thus the same stature as the
decisions of the Employment Security Commission
Board of Review or Employment Relations Com-
mission. The potential for review or reversal by

[121] MCR 2.613(C). *Tuttle v Dep't of State Highways,* 397 Mich 44;
243 NW2d 244 (1976).

[122] "All final decisions, findings, rulings and orders of any adminis-
trative officer or agency existing under the constitution or by law,
which are judicial or quasi-judicial and affect private rights or licen-
ses, shall be subject to direct review by the courts as provided by law.
This review shall include, as a minimum, the determination whether
such final decisions, findings, rulings and orders are authorized by
law; and, in cases in which a hearing is required, whether the same
are supported by competent, material and substantial evidence on the
whole record. Findings of fact in workmen's compensation proceed-
ings shall be conclusive in the absence of fraud unless otherwise
provided by law." Const 1963, art 6, § 28.

[123] MCL 421.35; MSA 17.537, MCL 421.38; MSA 17.540.

[124] MCL 423.3; MSA 17.454(3), MCL 423.23(3); MSA 17.454(25).

the appellate commission of a magistrate's decision does not make the decision insufficiently important when the review is under the same limited standard that is applicable to review by a circuit judge of a decision of the Employment Security Commission Board of Review or by the Court of Appeals of the Employment Relations Commission.

H

It is argued that Act 103 destroys rights of the referees in continued employment.

Although the Legislature may not have been required to establish the position of workers' compensation referee in the civil service system, it did so and may thereby have created legitimate expectations of continued employment. Whatever promise of continued employment may have been made to the referees when they were given civil service status can, however, be fulfilled without a decision by this Court that the Legislature could not enlarge the duties and function of workers' compensation hearing officers and require that they be selected by a different process, their tenure be limited, and they be more accountable in the political process.

The referees have civil service status. Act 103 does not deprive them of that status. A year remains before the referee positions are abolished effective March 31, 1987. There are a number of civil service employment opportunities in state government for former referees. They are all lawyers. Some may become employed in other departments of state government either as lawyers or in some other capacity. There are a large number of civil service hearing examiner/officer/referee/ALJ positions in state government. The Civil Service Commission is charged with the responsibility of administering the civil service system.

Some of the referees may be selected by the qualifications advisory committee for recommendation to the Governor for appointment as members of the Board of Magistrates or as members of the appellate commission, and some so recommended may be appointed by the Governor.

Act 103 contemplates that until July 1, 1989, the Governor may appoint, with the advice and consent of the Senate, senior hearing referees and former hearing referees to the WCAB to fill a vacancy or to temporarily increase the number of members on the appeal board to expedite decisions in the large backlog of cases before the board.[125]

## IX

The Civil Service Commission, the referees, and amici curiae make additional arguments.

### A

It is argued at some length that the elimination of the position of hearing referee was motivated by racial and sexual bias.

The record in respect of these claims has not been developed.

The referees are not precluded by today's decision of this Court sustaining the facial constitutionality of Act 103 from seeking to establish that Act 103 discriminates racially or sexually in violation of the constitution of this state or of the United States.

### B

It is claimed that the Civil Service Commission, not the Legislature, has plenary power to regulate the terms and conditions of the referees' employment.

---

[125] MCL 418.251(2); MSA 17.237(251)(2).

We agree with the circuit judge that the power
of the Civil Service Commission to "regulate all
conditions of employment in the classified ser-
vice"[126] does not preclude the Legislature from
eliminating a position once it is classified as within
the civil service system.

The provisions authorizing the Civil Service
Commission to "classify all positions" and empow-
ering the appointing authorities to "create or abol-
ish positions for reasons of administrative effi-
ciency"[127] do not in terms bar the Legislature from
creating new positions or eliminating old positions
and changing the respective duties and responsibil-
ities by law.

As indicated earlier, there is authority that the
Legislature is limited by a judge-made rule requir-
ing that it act in good faith, and not merely
transfer a civil service position to non-civil service
status.[128] It is again relevant that the Legislature
did not merely transfer the duties of the hearing
referees to the members of the Board of Magis-
trates. It vested the magistrates with the power,
presently vested in the members of the wcab, to
determine the facts with substantial finality and
the power to determine the facts with full finality
in cases involving less than $2,000.

The question whether a position within the civil
service system should be abolished for administra-
tive efficiency is a different question than whether
a position can properly be created outside of the
civil service system. The language concerning abo-
lition of a position for administrative efficiency
speaks of the elimination of redundant positions in
the classified service. The power to do so is vested
in department heads who may see a job that no

---

[126] Const 1963, art 11, § 5, ¶ 4.
[127] Const 1963, art 11, § 5, ¶¶ 4, 8.
[128] See n 54.

longer needs to be done. This provision does not limit the authority of the Legislature to provide that a function formerly performed by civil service employees henceforth shall be performed by a board or commission outside the civil service system. The Legislature is not powerless to eliminate a position in government once it is established.

The critical question in the instant case is not whether the Legislature can abolish or eliminate a position, but whether it can transfer duties and power exercised by a person holding a position covered by civil service to a board or commission. It if can do so, then the position is in effect eliminated, whether or not formally abolished, because then no further duty or power is attached to the position, the duties and power of which have been so transferred.

For reasons previously stated, the Legislature validly transferred the duties and power of the office of referee to a Board of Magistrates in connection with a substantial increase in the power and importance of the workers' compensation hearing officer function.

## C

We hold that § 206, abolishing the position of hearing referee, and § 213, creating a board of magistrates, of Act 103 do not violate Const 1963, art 11, § 5. The judgment of the circuit court is reversed, and we remand to the circuit court for further consideration of plaintiffs' other claims. The injunction entered December 2, 1985, is dissolved.

Pursuant to MCR 7.317(C)(3), the clerk is directed to issue the judgment order immediately.

WILLIAMS, C.J., and CAVANAGH and BOYLE, JJ., concurred with LEVIN, J.

Williams, C.J. (*concurring*). While I concur with Justice Levin's opinion holding that § 213 of 1985 PA 103, creating the Board of Workers' Compensation Magistrates, is constitutional, I write specially to emphasize several points I think are particularly important.

The issue presented in this case is whether the Board of Workers' Compensation Magistrates, the duties of which are adjudicative, who adjudicate individually, but who may perform certain administrative functions collectively, falls within the "members of boards and commissions" exception of the civil service amendment to the 1963 Constitution, art 11, § 5. My concurrence is based upon the following reasoning.

First, the primary rule of construction in interpreting constitutional language is that, wherever possible, an interpretation that does not create constitutional invalidity is preferred to one that does. *Council No 11, AFSCME v Civil Service Comm,* 408 Mich 385, 405; 292 NW2d 442 (1980). To the same effect is *People v Bricker,* 389 Mich 524, 528; 208 NW2d 172 (1973):

> We are duty bound under the Michigan Constitution to preserve the laws of this state and to that end to construe them if we can so that they conform to Federal and state constitutional requirements.

Second, in order to clarify the meaning of a constitutional provision, the circumstances surrounding its adoption can be examined. *Council No 11, supra.* The focus of those who enacted the civil service amendment, Const 1908, art 6, § 22, in 1940 was not only to eradicate the "evils in state civil service under the spoils system," *Council No 11,* 401, but to provide sufficient exemptions to

permit the operation of representative government with public responsibility. Such exemptions included "members of boards and commissions."

At this juncture, it is important to carefully consider the exact language[1] of the civil service amendment and the circumstances surrounding its adoption. As to the exact language, the pertinent text reads as follows:

> The classified state civil service shall consist of all positions in the state service *except those* filled by popular election, heads of principal departments, members of boards and commissions, the principal executive officer of boards and commissions heading principal departments, employees of courts of record, employees of the legislature, employees of the state institutions of higher education, all persons in the armed forces of the state, eight exempt positions in the office of the governor, and within each principal department, when

[1] The exact language of the amendment is significant with respect to another argument, namely that all excepted or exempted positions are "policy-making." It is true that many of the excepted positions are policy-making, including most but not all "those filled by popular election, heads of principal departments," etc. On the other hand, as to "employees of the legislature," while many assist in the making of policy, it is the legislators that make the policy, and certainly the door attendants et al., while they perform valuable functions, cannot be considered policy-makers. As for "employees of the state institutions of higher education [and] all persons in the armed forces of the state," it is clear that the vast majority of them do not perform policy-making functions. Finally, it is clear that the drafters of the civil service amendment recognized that the exemptions included both policy-making and non-policy-making positions. The drafters permitted "two other exempt positions, *one of which* shall be policy-making." (Emphasis added.)

In addition, contemporary reference to the Unemployment Compensation Appeal Board indicates that the exception for "boards" included the adjudicative function. We recognize that it is often said that judicial leading opinions enunciate "policy," but, if that is indeed "policy," it is not executive or legislative policy of which we believe the amendment speaks. In conclusion, therefore, we would find that whereas a "policy-making" factor may argue for the inclusion of a function within the "exceptions" to civil service coverage, it is not a sine qua non, as it is obvious that non-"policy-making" exceptions are also clearly contemplated and specified by the amendment.

requested by the department head, two other ex-
empt positions, one of which shall be policy-mak-
ing. The civil service commission may exempt
three additional positions of a policy-making na-
ture within each principal department. [Const
1963, art 11, § 5. Emphasis added.]

As to the circumstances surrounding the adop-
tion of the civil service amendment, it is important
to note that at the time the 1940 amendment was
adopted there existed legislation touching upon
two points in question here. First, legislation cre-
ated a board having solely adjudicative duties.
Second, legislation created at least two multimem-
ber boards or commissions which performed their
primary functions through individual members.
The Unemployment Compensation Appeal Board
consisted of three members, to be appointed by the
Governor, and had solely adjudicative duties. See
1937 PA 347.[2] At the same time, the decision of an
individual deputy member of the Industrial Acci-
dent Board (later referred to as compensation
commissioners) would stand as the decision of the
board or the commissioners unless review was
timely sought. 1921 PA 43, 60. In addition, exist-
ing legislation provided that "The [liquor control]
commission shall have the right and power to
suspend or revoke and *any commissioner* desig-
nated by the chairman shall have the right and
power to suspend pending a prompt hearing any
and all licenses . . . ." 1937 PA 281, § 20. Thus, it
was well within the contemplation of those who
framed the amendment to "except" from the clas-
sified civil service 1) a "board" which performed
solely adjudicative functions similar to the one at

[2] The minutes of a March 6, 1941, meeting of the Civil Service
Commission show that an order was adopted by the commission
stating that among the boards and commissions exempt from the
state civil service is the Unemployment Compensation Appeal Board.

issue in this case, and 2) a multimember commission which could perform its primary functions through individual commissioners.

Third, the instant Board of Magistrates has the necessary attributes of a "board" as that term has been interpreted by this Court in the only case considering the meaning of that term for purposes of the civil service amendment. In *Case v Liquor Control Comm,* 314 Mich 632; 23 NW2d 109 (1946), we held that the act creating the Liquor Control Commission and its Board of Hearing Examiners did not violate the amendment because the board was 1) a body of importance and dignity, and 2) independent from the appellate functions of the Liquor Control Commission.[3] Notably absent from this Court's discussion was any requirement that the board undertake *collective* action in order to qualify as a board within the meaning of the amendment. In addition, the enacters of the 1963 Constitution retained the exact language of the 1940 amendment, presumably with knowledge of this Court's construction in *Case.*

Consonant with *Case,* the legislation before us creates a board of considerable importance and dignity. The magistrates are appointed by the Governor and may be removed by the Governor only for good cause. MCL 418.213(1), (2); MSA 17.237(213)(1), (2). The magistrates have significant functions which are new responsibilities in comparison with those exercised by their predecessors, the hearing examiners: They must prepare written findings of fact and conclusions of law, MCL 418.847(2); MSA 17.237(847)(2), and their decisions are reviewable only for legal error and are consid-

---

[3] This concurrence should not be read to imply that merely because a body created by the Legislature has importance, dignity, and independence it is *required* to be exempt from civil service. The Legislature merely has the choice of placing it inside or outside that system if the body has these attributes.

ered conclusive if supported by competent, material, and substantial evidence on the record, MCL 418.861a(3); MSA 17.237(861a)(3). A magistrate's decision in disputes over claims of $2,000 or less is final and nonappealable in the absence of fraud. MCL 418.841(9); MSA 17.237(841)(9). In addition to its adjudicative duties, the newly created board has certain quasi-legislative and quasi-executive responsibilities: It has the authority to make rules and regulations to govern its own administrative hearing procedures, and it has the authority to hire and fire its own employees. MCL 418.213(6), (7); MSA 17.237(213)(6), (7).

The Board of Magistrates is also independent. The legislation characterizes the board as an "autonomous entity" and an "independent body." MCL 418.213(1), (7); MSA 17.237(213)(1), (7). The board is separate from the outgoing Workers' Compensation Appeal Board, the new Workers' Compensation Appeal Commission, and the remainder of the Department of Labor. The chairperson of the board has the general supervisory control over the board's employees and its work schedule. MCL 418.213(3); MSA 17.237(213)(3). In addition, the members' appointment by the Governor and the board's ability to create its own administrative hearing procedures and to hire and fire employees enhance its autonomy from other seats of power. MCL 418.213(6), (7); MSA 17.237(213)(6), (7).

The Board of Magistrates is also independent in its adjudicative role. The outcome of cases heard by the board, while ultimately reviewable by the appellate commission for errors of law or sufficiency of the evidence, is not subject to direction by a supervisory authority.

While the Board of Magistrates is not required to deliberate collectively on matters within its adjudicative authority, it may act collectively in

its quasi-legislative and quasi-executive functions. However, *Case* does not impose a collective-action requirement on the term "board" as it appears in the civil service amendment.[4]

The fourth and final reason for finding this statute constitutional is that treating this board as exempt from civil service requirements comports with the underlying purpose of the civil service amendment. This purpose was to protect the great bulk of civil servants from partisan hiring and firing while at the same time permitting popular representation and public accountability where appropriate to good government.

This exception not only comports with a reasonable and historically consistent analysis of the constitutional language, but also serves the intended constitutional purpose of permitting necessary flexibility in the system, thereby both providing job protection from partisan politics and maintaining public accountability. In this connection, it is appropriate to note that the Board of Magistrates was the creation of a genuine and widely supported movement, especially by those both in management and labor interested in the effective and economical operation of the workers' compensation system, to make the system more efficient by giving greater public representation and responsibility to those who perform the particular functions clothed in the public interest. These magistrates are key performers, not the "mere employees" that this Court in *Case* sought to protect from an overreaching, partisan Legislature. *Case, supra,* 641. The legislation received

---

[4] At the time the civil service amendment was adopted, the Civil Service Commission exempted, as a commission, the State Racing Commission, which consisted only of the Racing Commissioner. This commissioner then and now acted alone, performing no actions collectively. MCL 431.62; MSA 18.966(32). Yet his exemption from the civil service has never been questioned.

bipartisan support throughout its history. It was enacted by a Democratic House and a Republican Senate, and signed by a Democratic Governor with the general acclaim of the media and the public.

Lastly, the newly created Qualifications Advisory Committee, which will develop a qualifications examination and forward to the Governor names of qualified applicants for magistrate positions, ensures against the possibility of mere partisan maneuvering. The fixed terms of office for the magistrates, with removal only for cause, will also make their employment secure from partisan swings in government. Thus, the legislation strikes a healthy balance, as intended by the constitution, between insulating the magistrates from partisan pressures and keeping them mindful of their weighty responsibility to the public.

Therefore, because the instant legislation lies within a reasonable construction of the language and intentions of the civil service amendment, and does not open the door for evasion of the protective purposes of the amendment, I would find that the Board of Magistrates is a "board" within the intended meaning of the amendment and is, therefore, properly excepted from the civil service.

In summary, two rules of constitutional construction primarily compelled this analysis: the presumption of constitutionality, and the requirement that the constitution be construed in light of circumstances known to the framers at the time of the enactment of the civil service amendment. Legislation existing at that time permitted "boards" with solely adjudicative functions and boards and commissions which performed their primary functions through individual members. Thus, while the attributes of quasi-legislative or quasi-executive policy-making and collective action are relevant to the determination whether a board

is legitimately excepted from the civil service, such attributes are not necessarily determinative of the legitimate exception. Additional attributes which are relevant to this analysis are the independence, importance, and dignity of the board, and the degree to which the legislation strikes the balance intended by the constitution between protection against partisan politics and maintenance of representative and responsible government. Application of these factors to the instant legislation leads to the conclusion that the Workers' Compensation Board of Magistrates is properly excepted from the civil service.

Because the circuit court found the legislation unconstitutional on its face, it did not decide the plaintiffs' other claims for relief. Finding the legislation facially constitutional, we would remand this case to the circuit court for further proceedings on plaintiffs' remaining claims.

CAVANAGH and BOYLE, JJ., concurred with WILLIAMS, C.J.

ARCHER, J. (*dissenting*). This litigation arises out of a constitutional challenge to the 1985 legislative reform of the workers' compensation act, 1985 PA 103. Two key sections of the legislation are in dispute: § 206, which abolishes the position of hearing referee currently held by employees within the state's classified civil service, and § 213, which establishes a Board of Magistrates that would be excepted from the civil service.

We are asked to decide whether 1985 PA 103, §§ 206 and 213, MCL 418.206, 418.213; MSA 17.237(206), 17.237(213), violate the civil service provisions of art 11, § 5 of the Michigan Constitution.

We would hold that because the Board of Magistrates created under § 213 is not required to carry

out any of its primary functions as a collective body, it is not a true board for purposes of the "boards" and "commissions" exception to the civil service amendment. We would, therefore, declare that § 213 of 1985 PA 103 violates art 11, § 5 of the Michigan Constitution. Our decision would automatically render § 206 of 1985 PA 103, which abolishes the current position of hearing referee, and all other sections contained in 1985 PA 103 that are delineated as nonseverable from § 213 inoperative.

I

FACTS

Since 1980, Michigan's Governors and legislators have evidenced a strong desire to reform the state's workers' compensation system. In response to legitimate business concerns, while balancing the concerns of injured employees, 1980 PA 357, 1981 PA 192-203, 1982 PA 32, and 1983 PA 159 were approved by Governors William Milliken and James Blanchard. In furtherance of the reform of the workers' compensation system, Governor Blanchard, on September 14, 1983 appointed Professor Theodore J. St. Antoine of the University of Michigan Law School to be his special counselor on workers' compensation and to conduct a study and issue a report.

Professor St. Antoine submitted his report on *Workers' compensation in Michigan: Costs, benefits and fairness* to Governor Blanchard on December 12, 1984. Among other observations contained in his report, Professor St. Antoine noted: Hearing referees issue short-form awards with no statements of reasons for their decision, and as a result of hearings de novo before the Workers' Compensation Appeal Board, which announces its findings of fact and conclusions of law in writing, there was

a 7,000-case backlog.[1] In order to correct the problem, Professor St. Antoine recommended that findings of fact by the hearing referees be deemed conclusive if "supported by competent, material, and substantial evidence on the whole record" and that the hearing referees be required to prepare written findings of fact and conclusions of law.[2]

Professor St. Antoine acknowledged expressed concern by some that hearing referees were deficient in objectivity and impartiality of judgment. He concluded, however, that the claims of bias were exaggerated.[3] He did, nevertheless, urge the Legislature or the Civil Service Commission to establish a bipartisan Qualifications Advisory Committee to interview and evaluate prospective candidates for the position of hearing referee, with ratings to be transmitted confidentially to the appointing authority.[4]

Upon receipt of Professor St. Antoine's report, both the House and Senate introduced a series of bills and amendments to effectuate reform of the workers' compensation system. A conference committee of House and Senate members ultimately worked toward a compromise that resulted in the enactment of 1985 PA 103. The position of hearing referee was abolished in § 206. A Board of Magistrates, excepted from civil service, was established by § 213.[5] Section 4 of 1985 PA 103 tied § 213 to

[1] See St. Antoine, *Workers' compensation in Michigan: Costs, benefits and fairness,* pp 67-69.

[2] See St. Antoine, *supra,* p 71.

[3] See *id.,* p 72.

[4] See *id.,* p 75.

[5] "(1) The worker's compensation board of magistrates is established as an *autonomous entity* in the department of labor. The board shall consist of 30 members appointed by the governor with the advice and consent of the senate. The governor shall appoint the initial members of the board not later than March 31, 1986 and shall designate 1 of the appointees as the member that will be chairperson. A person shall not be appointed to the board who has not been recommended

many other sections of the law, so that if this Court found § 213 to be unconstitutional then most of the changes in the workers' compensation law

by the qualifications advisory committee. All members of the board shall be members in good standing of the state bar of Michigan.

"(2) The members of the board shall be appointed for terms of 4 years except that of the members first appointed, 10 shall serve for 2 years, 10 shall serve for 3 years, and 10 shall serve for 4 years. A member who has served for 12 years shall not be reappointed to a new term. A vacancy caused by the expiration of a term shall be filled in the same manner as the original appointment. A member shall not serve beyond the expiration of his or her term unless the qualifications advisory committee fails to submit a recommendation to the governor before the expiration of the term. A member may be reappointed. A member appointed to fill a vacancy created other than by expiration of a term shall be appointed for the balance of the unexpired term. A member of the board may be removed by the governor for good cause which shall be explained in writing to the worker's compensation magistrate. Good cause for removal shall include, but not be limited to, lack of productivity or other neglect of duties.

"(3) The governor may designate a member of the board as the chairperson upon a vacancy occurring in that position. The chairperson of the board shall have general supervisory control of and be in charge of the employees of the board and the assignment and scheduling of the work of the board. The chairperson may also establish productivity standards that are to be adhered to by employees of the board, the board, and individual magistrates. Each member of the board shall devote full time to the functions of the board. Each member of the board shall personally perform the duties of the office during the hours generally worked by officers and employees of the executive departments of the state.

"(4) The chairperson of the board shall serve as chairperson at the pleasure of the governor.

"(5) Each member of the board shall receive an annual salary and shall be entitled to necessary traveling expenses incurred in the performance of official duties subject to the standardized travel regulations of the state.

"(6) The *board may employ the staff it considers necessary* to be able to perform its duties under this act which may include legal assistants for the purpose of legal research and otherwise assisting the board and individual members of the board.

"(7) The board is *an independent body* with the powers and duties as provided for under this act. *The board may promulgate rules on administrative hearing procedures for purposes under this act.*

"(8) The chairperson of the board may assign and reassign worker's compensation magistrates to hear cases at locations in this state.

"(9) The department of labor shall provide suitable office space for the board of worker's compensation magistrates and the employees of the board." (Emphasis added.)

would not go into effect.

Governor Blanchard approved 1985 PA 103 on July 30, 1985.

On August 8, 1985, plaintiff Civil Service Commission filed a complaint in the Ingham Circuit Court, seeking a declaratory ruling that §§ 206 and 213 are in violation of Const 1963, art 11, § 5. The commission also sought injunctive relief.

On August 16, 1985, plaintiffs hearing referees filed a similar action in the Ingham Circuit Court, seeking a declaratory ruling that §§ 206 and 213 are unconstitutional. The hearing referees also sought a writ of mandamus against defendants[6] to direct them to continue employment of the current hearing referees within the Workers' Compensation Bureau and classified civil service.

On September 17, 1985, Governor Blanchard filed an Executive Message with this Court requesting that the Ingham Circuit Court be authorized to certify a controlling question. In lieu of granting the Governor's request, we directed the Ingham Circuit Court to establish an accelerated schedule of proceedings to include discovery[7] and trial, and to issue a final judgment in this case. On December 2, 1985, the Ingham Circuit Court issued a final judgment.

Relying on this Court's holding in *Case v Liquor*

---

[6] When the hearing referees filed their original complaint, they named members of the Civil Service Commission as defendants. Once the hearing referees became aware of the fact that the CSC had filed its own lawsuit challenging the constitutionality of 1985 PA 103, they filed a motion for "realignment" of the parties. The circuit court granted the motion, and the individually named members of the CSC were dropped as defendants and added as plaintiffs in the action brought by the hearing referees.

[7] Prior to the circuit court's declaratory ruling, the court considered opposing motions filed by plaintiffs to compel discovery and by defendants for a protective order. The court denied plaintiffs' motion and granted defendants' motion on the basis that the information sought to be discovered was not relevant to plaintiffs' claim under Const 1963, art 11, § 5.

*Control Comm,* 314 Mich 632; 23 NW2d 109 (1946), the circuit court declared § 213 unconstitutional, stating:

> It does not appear the Legislature sought to create a body which, by virtue of its importance, is deserving of the name "board" and whose members ought therefor to be excepted from the classified service. Rather, the impression is unavoidable that the Legislature sought simply to create unclassified positions in the interests of enhanced accountability, and then attempted to justify their exclusion from the classified service by incorporating them as a "board." Apart from this exclusionary purpose, the incorporation of the magistrates as a board appears to play no independent meaningful role in the functioning of the worker's compensation system. The board is not a body of importance and dignity. It is merely a tool, an artifice whose sole purpose is to legitimize the removal of positions from the classified service. This is impermissible under paragraph 1 of Article 11, § 5. In view of the historical purpose of paragraph 1, the common understanding of those who ratified it, and the construction given it in *Case,* it is clear that § 213 of the Act must be stricken as unconstitutional.

The defendants appealed to the Court of Appeals on December 9, 1985. The Governor then filed a request with this Court asking that we certify the following question for immediate appeal here:

> Do 1985 PA 103, § 213, which establishes a Worker's Compensation Board of Magistrates as an autonomous entity and independent body in the Department of Labor, as part of legislation intended by the Legislature to ". . . increase the administrative efficiency of the adjudicative processes of the worker's compensation system; to improve the qualifications of the persons having adjudicative functions within the worker's compen-

sation system; to prescribe certain powers and duties; to create the board of worker's compensation magistrates . . . ; [and] to provide certain procedures for the resolution of claims . . ."; and 1985 PA 103, § 206, which abolishes as of March 31, 1987 the Legislatively created position of Hearing Referee, occupied by civil service personnel classified as Administrative Law Examiners, violate Article 11, § 5 of the Michigan Constitution?

We granted leave for immediate appeal on December 20, 1985.

II

ISSUE: DO 1985 PA 103, §§ 206 AND 213 VIOLATE THE CIVIL SERVICE PROVISIONS IN ARTICLE 11, § 5 OF THE MICHIGAN CONSTITUTION?

Defendants assert that because § 213 creates a Board of Magistrates, an independent and autonomous body of importance and dignity, it is exempt from the classified civil service under art 11, § 5 of the Michigan Constitution.

Plaintiffs, on the other hand, argue that § 213 is unconstitutional because it does not create a true board. They assert that § 213 creates a board in name only.[8] We believe that the question of the board's constitutionality is to be answered by analyzing the duties of the board, and not by assessing the motives of the Legislature in creating it.

The first paragraph of art 11, § 5 reads in pertinent part:

The classified state civil service shall consist of all positions in the state service except those filled

---

[8] The plaintiffs also claim that the Legislature acted in bad faith in creating the Board of Magistrates and in abolishing the position of hearing referee in the Workers' Compensation Bureau. Additionally, the hearing referees claim that 1985 PA 103 violates state and federal constitutional provisions other than the civil service amendment.

by popular election, heads of principal departments, *members of boards or commissions,* the principal executive officer of boards and commissions heading principal departments, employees of courts of record, employees of the legislature, employees of the state institutions of higher education, all persons in the armed forces of the state, eight exempt positions in the office of the governor, and within each principal department, when requested by the department head, two other exempt positions, one of which shall be policy-making. [Emphasis added.]

Defendants rely on the quoted reference to the "boards or commissions" exemption from the classified civil service to support their argument that § 213 does not violate art 11, § 5.

## III

### HISTORICAL BACKGROUND

A brief review of the historical background of the civil service amendment is necessary before we determine the constitutionality of the challenged section of 1985 PA 103. Prior to the adoption of the civil service amendment by the people of Michigan, the state had experienced a longstanding "spoils system" of state personnel practices. In 1935, the Civil Service Study Commission was appointed by Governor Frank D. Fitzgerald to conduct a study of Michigan's personnel practices. After conducting a year-long study, the study commission reported its findings and recommendations to the Governor. Michigan's civil service system came into being as a result of the 1936 report of the study commission.[9]

The Legislature responded to the 1936 study

---

[9] See Litchfield, *Michigan's experience with civil service,* 2 Personnel Administration (No 4), pp 1-2 (December, 1939) (publication is now called Management Review).

commission report by passing 1937 PA 346[10] which established the state civil service system. The act purported to eliminate the "spoils system" and to contribute to the merit system in public employment.[11] This was accomplished at least in part through the act's prohibition of civil servant participation in political activities and assessment schemes during hours of employment.[12] Also, the act exempted boards and commissions required by law to be appointed by the Governor from the classified civil service.

In 1939, Michigan experienced an almost complete reversal in its civil service policy with the passage of 1939 PA 97, which amended 1937 PA 346. While maintaining the ban on political activity by civil servants by banning all political activity during and after hours of employment, 1939 PA 97 contained a number of destructive provisions which seriously weakened the newly created civil service system.[13]

In 1940, the people of Michigan adopted the civil service amendment to the constitution which superseded 1937 PA 346 and set up a new commission and system.[14] The amendment provided that all positions in the state service were a part of the state civil service except specific listed positions,[15]

___

[10] It should be noted that 1937 PA 346 exempted from the classified civil service boards and commissions required by law to be appointed by the Governor.

[11] See Litchfield, n 9 *supra*, pp 2-3.

[12] See *Council No 11, AFSCME v Civil Service Comm,* 408 Mich 385, 398; 292 NW2d 442 (1980), for the pertinent provisions of the statute.

[13] Boards and commissions required by law to be appointed by the Governor continued to be exempt under 1939 PA 97, § 7(1)(e).

[14] Const 1908, art 6, § 22, effective January 1, 1941.

[15] The amendment read in pertinent part:

"The state civil service shall consist of all positions in the state service except those filled by popular election, heads of departments, members of boards and commissions, employees of courts of record, of the legislature, of the higher educational institutions recognized by

including boards and commissions.

The people adopted a new constitution in 1963. Const 1963, art 11, § 5 revised the civil service amendment adopted in 1940 by strengthening the role of the chief executive and the administrator and by providing for limited legislative control of wage increases under specified circumstances. Also provided were additional exempt positions.

## IV

### ANALYSIS

Turning to the issue presented in this case, we must determine the common understanding of the words "boards" and "commissions" as contained in art 11, § 5.

In *Traverse School Dist v Attorney General*, 384 Mich 390, 405-406; 185 NW2d 9 (1971), we set forth the following three rules of construction of a constitution: 1) the primary rule is the rule of "common understanding" of the words employed; 2) "to clarify [the] meaning [of the words employed], the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered"; 3) "wherever possible an interpretation that does not create constitutional invalidity is preferred to one that does."

In *Oakland Co Taxpayers' League v Oakland Co Supervisors*, 355 Mich 305, 323; 94 NW2d 875 (1959), a test was formulated to determine whether a statute is constitutional. We held:

> [T]his Court will not declare a statute unconstitutional unless it is plain that it violates some

the state constitution, all persons in the military and naval forces of the state, and not to exceed 2 other exempt positions for each elected administrative officer, and each department, board and commission."

provisions of the Constitution and the constitutionality of the act will be supported by all possible presumptions not clearly inconsistent with the language and the subject matter.

See also *Case v Liquor Control Comm, supra,* 638.

A "board" is commonly understood as a body composed of more than one person which performs its primary functions collectively rather than through individual members. *People v Maynard,* 15 Mich 463 (1867). In *Maynard,* the issue was whether legislation organizing a new township and county was invalid because the county included only one township. The Court held that the new act failed to create a viable "board of supervisors," as required by the constitution, because *one* supervisor could not act as a "board." It stated that among the necessary incidents of a county are townships "whose supervisors *conjointly may exercise the legislative and administrative powers* of the corporation." *Id.,* 468 (emphasis added). The county board of supervisors' power could not be delegated to one person, because the board was designed to act as an "aggregation of town officers." *Id.,* 472.

In a separate concurrence, Justice Cooley further elaborated upon the necessary attributes of a "board of supervisors":

> The powers conferred upon [the county board] by the constitution are of very high importance, some of them legislative in their character, requiring consultation, discussion and deliberation, and such as in no part of our political system are conferred upon single individuals. . . . *[T]he term "board," in its derivation as well as in its ordinary use, indicates a deliberative body, composed of more than one person.* [*Id.,* 473. Emphasis added.]

This common understanding of the meaning of

"board" is again exemplified in *Case v Liquor Control, supra,* which analyzed that term for purposes of the civil service exemption at issue here. Both defendants and plaintiffs rely on this Court's holding in *Case* as authority for their respective arguments concerning the constitutionality of § 213.

In *Case,* this Court considered whether an amendment to the Liquor Control Act of 1933,[16] which created a Board of Hearing Examiners, violated the civil service amendment. The act provided that "the hearing examiners or any member thereof shall conduct hearings on questions

[16] 1933 (Ex Sess) PA 8, § 52, as amended by 1945 PA 133, 1929 CL (1945 Supp) 9209-20a; MSA 18.975(1), read:

"There is hereby created a board of hearing examiners to consist of 3 members to be appointed by the governor, by and with the advice and consent of the senate, for terms of 6 years each: Provided, That of the members first appointed 1 shall be appointed for a term of 2 years, 1 for a term of 4 years and 1 for a term of 6 years. Any vacancy shall be filled by the governor for the unexpired term in the same manner. Members of the board may be removed by the governor for misfeasance, malfeasance and nonfeasance in office. Members of the board shall receive an annual compensation of $6,000.00 and shall be entitled to actual and necessary expenses incurred in the performance of duties, to be paid in the same manner as salaries and expenses of other state officers are paid. Such board of hearing examiners or any member thereof shall conduct hearings on questions referred to the board by the commission, under such rules and regulations as the commission may establish. *The examiners shall report their findings to the commission for decision.* Each member of the board is authorized to examine witnesses and administer oaths. The attorney general shall assign 3 of his assistants to the commission. *In all instances when a license is to be either suspended or revoked the commission shall cause a complaint to be filed with said board whereupon said board shall conduct a hearing limited to the facts and law and rules and regulations of the liquor control commission as specified in said complaint. In the conducting of hearings no hearsay testimony shall be admissible and the licensees named in the complaint shall have the right to have all witnesses testify in person at the hearing.* The findings of the board shall be based upon the facts and the law and the rules and regulations of the liquor control commission. A statement of the facts may be requested by either the commission or the licensee. The complaint filed with the board shall specify the date of the alleged offense, the names of the witnesses, and any other facts that may be in issue at the hearing." (Emphasis added.)

referred to the board by the commission . . . ."
The act also provided that "[i]n all instances when
a license is to be either suspended or revoked the
commission shall cause a complaint to be filed
with said *board* whereupon said *board* shall con-
duct a hearing . . . ." (Emphasis added.) We held
that the statute creating the Board of Hearing
Examiners did not violate the civil service amend-
ment, stating:

> The legislature by section 5a . . . created a
> board of importance and in language that showed
> that the appointment of mere employees was not
> contemplated, but an additional auxiliary body to
> assist the commission. *The mere labeling of a body
> of employees as a board would be insufficient,* but
> that was not the legislative intent as seen by the
> wording of the act. It was to be a real board of
> hearing referees which was to be independent of
> the commission, but its findings would not bind
> the commission. We believe that the creation of a
> body of such importance and dignity, and charac-
> terized by the legislature as a board, as a matter
> of fact created a board which is expressly excepted
> by the civil service amendment. [314 Mich 641.
> Emphasis added.]

The statute construed in *Case* authorized the
board or any member thereof to conduct hearings
on questions referred to the board by the commis-
sion. However, in instances where the commission
filed a complaint against a licensee, the statute
provided that the *board* should hold a hearing.
Individual members of the board were not autho-
rized to hold such hearings. Hence, the Board of
Hearing Examiners was required by statute to
conduct hearings on complaints filed by the Liquor
Control Commission as a collective entity. In con-
trast, we note that none of the provisions con-
tained in 1985 PA 103, including § 213, require the
Board of Magistrates to function as a collective
body.

Relying on *Napuche v Liquor Control Comm,*
336 Mich 398, 401; 58 NW2d 118 (1953), the major-
ity states that the practical construction of the
statute presented in *Case* was that any member of
the board could conduct a hearing on a complaint
against a licensee seeking a suspension or revoca-
tion of a license. The plain language of the statute
in *Case* indicates that the board or any member
could conduct hearings on questions referred to
the board by the commission. The statute, how-
ever, required the board to conduct hearings on
complaints to revoke or suspend a liquor license
which were filed by the commission. There was no
provision authorizing any member of the Board of
Hearing Examiners to conduct a hearing on com-
plaints filed by the commission. *Case* can be distin-
guished from *Napuche* because the *Case* Court was
deciding the constitutionality of the challenged
act, the problem we are confronted with in this
case. The *Napuche* Court, however, was not con-
fronted with the constitutionality of the statute
which established the Board of Hearing Examin-
ers. Instead, the question presented in *Napuche*
was whether the plaintiffs were afforded due pro-
cess when the Liquor Control Commission did not
conduct its own hearing, but relied on the testi-
mony received at a hearing conducted by a hear-
ing examiner. The Court concluded that plaintiffs
did receive their due process rights because plain-
tiffs were afforded an opportunity to be heard at
the hearing conducted by the hearing examiner
and the Liquor Control Commission had access to
the transcript.

A second rule of constitutional interpretation
requires an examination of the circumstances sur-
rounding the adoption of a provision. A review of
all Michigan boards and commissions in existence
during the time the 1940 civil service amendment

was adopted by the people,[17] indicates that the boards or commissions were required to perform at least some of their primary functions as a collective body.

We summarize some examples of the duties and characteristics of state boards and commissions as they existed in 1940.

The Unemployment Compensation Commission was created by statute[18] in 1936 and consisted of four members appointed by the Governor with the advice and consent of the Senate. Three members constituted a quorum for the transaction of commission business. The commission was authorized to prescribe its organization and methods of procedure. It was responsible for developing rules and regulations to reduce unemployment, to encourage and assist in the adoption of practical methods of vocational training, retraining, and vocational guidance for use during times of business depression and unemployment, and to promote the reemployment of workers throughout the state. Hearings concerning the policies or rules and regulations of the commission were to be held before an appeal tribunal or the commission. Individual members of the commission were authorized to issue subpoenas to persons who were required to appear before the commission or its duly authorized agent to be examined regarding any matter within the scope of inquiry or investigation being conducted by the commission. The commission was required to establish regulations providing for the examination of claims, the determination of their validity, and the amount and duration of benefits to be paid. Unemployment compensation claims were to be examined by representatives designated by the commission. These representatives made

---

[17] See 1939-40 Michigan Manual, pp 664-682.
[18] 1936 (Ex Sess) PA 1.

determinations of fact which were appealable to a referee employed by the commission. Referee decisions were final decisions of the commission unless timely appealed to the Unemployment Compensation Appeal Board, discussed below. The commission was independent and employed its own staff. The commission was also a policy-making body which was required by statute to transact its business through a quorum of three members. Hence, it was required to carry out at least part of its decisionmaking functions collectively.

A three-member Unemployment Compensation Appeal Board was provided for in a statute[19] enacted to amend the statute which created the Unemployment Compensation Commission. The statute required that the appeal board members be appointed by the Governor with the advice and consent of the Senate. The appeal board on its own motion was authorized to affirm, modify, or set aside any decision of a referee on the evidence submitted to the referee, or direct the taking of additional evidence, or permit any of the parties to initiate further appeals before it. The appeal board was empowered to remove to itself or transfer to another referee the proceedings in any claim pending before a referee. Any proceedings so removed to the appeal board had to be heard by *a quorum of the board.* While the statute provided that any member of the appeal board was authorized to administer oaths, take depositions, and issue and enforce subpoenas, persons appealing a referee decision had to appear before the *board* and be examined. The appeal board was independent and was required by statute to act as a board to make its own motion to affirm, modify, or set aside any decision of a referee.

[19] 1937 PA 347, amending 1936 (Ex Sess) PA 1.

The Labor Mediation Board, created by statute[20] in 1939, consisted of three members appointed by the Governor with the advice and consent of the Senate. The statute provided that two members constituted a quorum, but "official orders . . . require[d] concurrence of a majority of the board." The board was independent and responsible for mediating labor disputes between organized employees and employers in Michigan. The board, each member and each person designated had power to hold public or private hearings, subpoena witnesses, and administer oaths. Yet, official orders of the board required concurrence by at least two of the three members of the board.

The Liquor Control Commission was created by statute[21] in 1933 and consisted of five members. Three of the members were appointed by the Governor with the advice and consent of the Senate. The Governor and the Secretary of State served as ex-officio members of the commission. The commission, and not individual members, was authorized by statute to establish policies concerning the sale and distribution of alcoholic beverages in Michigan. The commission was also empowered to issue and revoke or suspend liquor licenses. The policies established by the commission included the fixing of prices of alcoholic beverages to be sold by specially designated distributors, and the uniform pricing of alcohol to be sold by state liquor stores. The commission also designated hours within which liquor could be sold. The policy-making functions of the Liquor Control Commission were carried out through collective decisionmaking.

The State Hospital Commission was created by

[20] 1939 PA 176.
[21] 1933 (Ex Sess) PA 8.

statute[22] in 1937 and consisted of seven members appointed by the Governor with the advice and consent of the Senate. The commission was required to hold not less than ten meetings per year. It had jurisdiction over the state mental institutions. The entire hospital commission, and not individual members, was responsible for making policies concerning the "methods of care, treatment, and prevention of insanity, feeble-mindedness, and epilepsy." It was also responsible for developing a statewide mental hygiene program. The commission carried out its policy-making functions through collective decisionmaking.

The Board of Aeronautics, created by statute[23] in 1929, was composed of five members to be appointed by the Governor with the advice and consent of the Senate. The State Highway Commissioner was directed and authorized to cooperate with the board. The Board of Aeronautics was given general supervision and control over all airports and landing fields used for commercial purposes, all state and municipal airports, and all schools of aviation. It was specifically empowered to develop rules and regulations governing commercial airports and the curriculum for the schools of aviation. Additionally, the board reviewed and approved applications to operate airports, landing fields, and schools of aviation. The statute creating the Board of Aeronautics did not authorize individual members of the board to make decisions concerning the rules and regulations or on applications submitted to the board.

Finally, the Athletic Board of Control, created by statute[24] in 1939 consisted of five members. Four members were appointed by the Governor

22 1937 PA 104.
23 1929 PA 177.
24 1939 PA 205.

with the advice and consent of the Senate. The board was headed by the State Athletic Commissioner. The board had sole jurisdiction over all boxing and sparring matches, wrestling contests, and exhibitions held in the state. The board collectively made decisions concerning the issuance and revocation of licenses. Rulings of the commissioner on matters not covered by the act governing the Athletic Board of Control were to be final only until the next regular meeting of the entire board. Special meetings of the entire board could be requested by any party aggrieved by a ruling of the commissioner.

Our review of the above boards and commissions indicates that they were independent and they were responsible for making policies, or, as in the case of the Labor Mediation Board, settling disputes in their respective areas. At least some of the members on each of these bodies had to be appointed by the Governor. We believe that these boards carried out their primary functions through collective decisionmaking. None of the statutes creating these boards and commissions authorized individual members to carry out all of the board's or commission's primary functions.[25]

---

[25] The majority states that at the time the civil service amendment was adopted there were at least two commissions which consisted of only one person. The Racing Commission consisted of the Racing Commissioner who was empowered to hire employees for purposes of the racing commission act. The Racing Commissioner was also empowered to fix and determine the salaries of the commission's employees. The Corporation and Securities Commission consisted of the Corporation and Securities Commissioner, who was empowered to appoint three subordinate deputy commissioners. The Racing Commissioner and the Corporation and Securities Commissioner were department heads. We believe that the majority mistakenly concludes that these two commissioners acted as a commission of one when the commissioners were mere department heads exempted from the civil service amendment under the department head exception.

Further, the 1939 Michigan Manual listed the Racing Commissioner and the Corporation and Securities Commissioner on page 639 under "Officers appointed by the Governor, with the approval of the

We conclude that the people, in adopting the civil service amendment in 1940, commonly understood the words "boards or commissions" to mean a body which carried out all or some of its primary functions as a collective entity. We do not believe that the common understanding of these two words changed when the people adopted Const 1963, art 11, § 5.

We note that, in declaring that "[t]he classified state civil service shall consist of all positions in the state service . . . ," art 11, § 5, with numerical specificity, excepts from the covered principal departments of state government only the department head and no more than five additional positions. That leaves within the classified service some 57,000 executive branch state employees, including a wide spectrum of professionals, division and bureau chiefs, institutional directors, and high ranking police officials, many of whom are responsible for the supervision of thousands of employees and the expenditure of millions of dollars of public funds.

The expression of such closely guarded numerical exceptions within the operating departments of state government, leaving within the classified service positions of high importance, leads us to believe that the amendment drafters would not, in turn, undo their work by exempting boards and commissions unless they were uniquely different from other functions of state government. Our review of the boards and commissions extant in 1940 clearly reveals those distinguishing charac-

Senate." Included in that list were all department heads but none of the boards and commissions. Beginning on page 664, there is a list of "State Boards and Commissions," among which the Racing Commissioner was not included. Interestingly enough, there was included under that heading a Michigan Corporation and Securities *Commission* comprised of five members.

teristics which we feel motivated the boards and commissions exception.

We agree with the majority that independence or autonomy is one of those characteristics; however, we cannot agree with their dismissal of the collective deliberation requirement, which was so common to the 1940 boards and commissions and which represents the most common understanding, literally and historically, of the words "boards and commissions."

On the basis of the above discussion, we would hold that the following three criteria should be used in determining whether a statute validly creates a civil service exempt board or commission under the Michigan Constitution. Members of the board or commission should be appointed by the Governor or the Legislature. The members of these bodies should be required by statute to perform some of their primary decisionmaking functions collectively either as an entire board or commission or through panels of the bodies. The board or commission should also be independent in the exercise of its principal responsibility and have either a policy-making or an adjudicative role.

## CONCLUSION

We would hold that because the Board of Magistrates created under § 213 is not required to carry out any of its primary functions as a collective entity, the board is not a true board for purposes of the "boards" and "commissions" exception to the civil service amendment. We, therefore, would declare that § 213 violates art 11, § 5.[26]

---

[26] We note that Justice LEVIN states in his opinion that the Workers' Compensation Appeal Board no longer carries out its functions as a collective body or entity. Our holding in this case would not result in making the existing Workers' Compensation Appeal Board uncon-

Our decision in this case would automatically render § 206, which abolishes the current position of hearing referee, and all other sections contained in 1985 PA 103 which are nonseverable from § 213 inoperative.

Our holding would make it unnecessary to address the remaining issues raised by plaintiffs and the various amici curiae because they all challenge the constitutionality of § 206.

Brickley and Riley, JJ., concurred with Archer, J.

stitutional under Const 1963, art 11, § 5. As we noted above, a board which sits in panels to discharge its adjudicative or administrative functions is not unconstitutional.